**STATE OF HAWAI'I**, Plaintiff–Appellee, v. **MARK RADCLIFFE**, Defendant–Appellant

NO. 16215

(CR. NO. 91–0760)

OCTOBER 7, 1993

BURNS, C.J., HEEN, AND WATANABE, JJ.

630

OPINION OF THE COURT BY HEEN, J.

In this appeal by Defendant–Appellant Mark Radcliffe (Defendant), we consider only his conviction for the offenses of Robbery in the First Degree, Hawai'i Revised Statutes (HRS) § 708–840(1)(b)(ii) (1985) (Count I), and Assault in the Third Degree (Count III).[1] HRS § 707–712(1)(a) (1985). The State

---

[1] Count III originally charged Defendant with assault in the second degree. However, on March 3, 1992, the court granted Defendant's motion for judgment of acquittal on Count III on the ground that the injury suffered by the one injured victim was not a serious bodily injury and submitted Count III to the jury as a reduced charge of assault in the third degree.

concedes that the trial court erred in denying Defendant's motion for judgment of acquittal on Count II of the indictment, Possession, Use or Threat to Use a Deadly Weapon in the Commission of a Crime. HRS § 134–51(b) (Supp. 1992).[2] Accordingly, we reverse Defendant's conviction on Count II and, after a review of the record, vacate the convictions on Counts I and III.

Defendant argues that the trial court erred in:

(1) granting immunity to Defendant's alleged victims from any prosecution for perjury that might arise from their testimony in this case; and

(2) instructing the jury on the elements of the offense of robbery in the first degree.[3]

## 1.

### THE IMMUNITY GRANT

#### a.

On March 19, 1991, the police arrived at the home of Defendant's parents, Lester (Lester) and Martha (Martha) Radcliffe to

---

[2] The answering brief concedes that (1) the State failed to prove that the paring knife allegedly used by Defendant was a "deadly or dangerous weapon" within the meaning of Hawai'i Revised Statutes (HRS) § 708–840(2) (Supp. 1992); and (2) the court failed to properly instruct the jury on the legal definition of a deadly or dangerous weapon.

[3] Defendant also argues that the trial court erred in (1) overruling Defendant's objection when the prosecutor asked Defendant on cross–examination if he had "been driving under the influence of intoxicating liquor" on the day of the incident; and (2) admitting into evidence the written statements given to the police by the alleged victims. We disagree.

First, our review of the record indicates that, even if the court erred in overruling the objection, the error was harmless, since the record contains a plethora of testimony, including Defendant's, that he had been drinking the whole day of the event, was intoxicated, and had driven an automobile.

Second, the fact, as discussed in the opinion, that the victims recanted their statements affects the weight of the statements, not their admissibility.

investigate a report of "an argument involving a knife[,]" and found Lester with a blackened left eye and a slight cut over his right eye. The police obtained separate signed statements from both Lester and Martha, indicating unequivocally that at one point in the day Defendant had punched Lester. Additionally, in her statement, Martha stated that later, while Defendant was holding a paring knife to Lester's throat and demanding money from him, Martha gave Defendant $80, "in hopes that he would leave Lester and [Martha] alone." Defendant was arrested.

Six days later, at Defendant's preliminary hearing on these charges, Lester testified that what had occurred was a "little ruckus[,] . . . little bit of a disagreement and a struggle." Lester testified that he had grabbed Defendant by the forearm to prevent Defendant from leaving the house and driving Lester's automobile because Defendant was intoxicated; in attempting to free himself from Lester's grasp, Defendant swung at and hit Lester in the face, causing a black eye and an abrasion. Lester did not recall telling the police that Defendant had held a knife at Lester's throat and did not recall signing any statement. Lester also testified that Defendant was merely waving the knife around and had not held it at Lester's throat. Martha did not testify at the preliminary hearing.

On February 24, 1992, Lester and Martha moved to quash the subpoenas served on them requiring them to testify at trial. In an affidavit attached to the motion their counsel indicated that, if they were called to testify, both Lester and Martha would disclaim their statements to the police and testify that no criminal offenses occurred in their home on the day in question. Additionally, if Lester and Martha were called to testify they intended to invoke their constitutional privilege against incriminating themselves in the offense of rendering a false report of a crime to the police. HRS § 710–1015 (1985). The court orally denied the motion at a hearing that day and directed Lester and Martha to return the next day for the trial.

On February 25, 1992, the State filed two identical applications under HRS § 621C–4 (1985)[4] for (1) a grant to Lester and Martha of transactional immunity from prosecution for any act, transaction, matter or thing concerning which each of them would testify relating to the March 19, 1991 incident, and (2) an order directing Lester and Martha to testify regarding the incident. After a hearing on the motion that day, the court issued identical orders to Lester and Martha directing them to testify about the incident and ordering that they

> shall not be prosecuted, nor punished, in any future criminal action or proceeding for, or on account of any act, transaction, matter or thing concerning that which [Lester and Martha] provide[] testimony with regards to an incident . . . except that [Lester and Martha] may be prosecuted for obstructing justice or for any other criminal offense stemming from . . . failure to comply with this order.

At that same hearing, the court and the parties agreed that the immunity grant would apply to the possible false reporting charge. However, Lester's and Martha's attorney questioned whether Lester could be prosecuted for a variance between his preliminary hearing testimony and his trial testimony. At that point the deputy

---

[4] HRS § 621C–4 (1985) provides:

> **Transactional immunity.** If a person is ordered to testify or produce a record, document, or other object under this chapter and the order specifies that the person is granted transactional immunity pursuant to this section, such person shall not be prosecuted or punished in any criminal action or proceeding for or on account of any act, transaction, matter, or thing concerning which the person is so ordered to testify or produce a record, document, or other object, except that the person may be prosecuted for perjury, for giving a false statement, or for an offense involving a failure to comply with the order.

prosecuting attorney stated that "the State intends to afford immunity for perjury as well."[5]

During Martha's trial testimony, she denied that Defendant had punched Lester or that Defendant had held a knife to Lester's throat and demanded money. She also disavowed making such statements to the police and denied reading the statement before signing it.

Additionally, the following dialogue took place:

Q. [By the prosecutor] You're testifying today under a grant of immunity. Is that right?

A. That's right.

Q. So whatever you say in court today, whether it be the truth or whether it be a lie, there's no legal consequence for you. Is that right?

A. I don't understand what you're asking me.

Q. I mean, if you lie in court today, you can't be charged with perjury.

A. I've been told to tell the truth.

Q. If you lie in court today, you can't be charged with perjury.

A. Can I speak with my attorney, please.

THE COURT: Mr. Thompson [Martha's counsel].

(Witness conferring with counsel.)

A. I've been told that if I lied today, I could be charged with perjury.

THE COURT: Counsel, approach the bench, please.

In the ensuing bench conference, the court and counsel clarified that the prosecutor's statement during the hearing on the application, that "the State intends to afford immunity from

---

[5] On March 3, 1992, the prosecutor indicated that the immunity covered both Lester's and Martha's testimony as to all the counts.

perjury as well[,]" included any possible charge of perjury from Lester's and Martha's trial testimony. Martha's counsel conferred with her again, after which the following dialogue occurred:

Q. [By the prosecutor] Isn't it true, Mrs. Radcliffe, that you could lie on the stand today and you face no legal consequences?

A. I have been advised that I am — I cannot be charged with perjury at all.

The next day, Defendant moved for a mistrial on the ground that the prosecutor's actions in granting absolute immunity, including immunity from perjury for Lester's and Martha's trial testimony, was prosecutorial misconduct. Defendant's position was that the State had granted Lester and Martha immunity for the purpose of impeaching them. The court denied the motion.

Lester's testimony was similar to his preliminary hearing testimony, *i.e.*, the injuries he received were inadvertently caused by Defendant; Defendant only waved a knife at him; and although he signed the statement the police prepared, he disagreed with its contents, felt "coerced and intimidated" by the police presence, and only signed it after one of the police officers guaranteed that the statement could be withdrawn at any time.

During Lester's re–direct examination by the prosecutor, the following question and answer were stated:

Q. You could be testifying today and you can lie on the stand and there's absolutely no legal consequences to you; is that right?

A. That's what I understand.

The next day, Defendant again moved for a mistrial. This time, defense counsel argued that the court had no statutory authority to grant immunity against prosecution for perjury and that the immunity nullified the witnesses' oath. The motion was denied.

Lester's and Martha's statements were introduced in evidence during the trial.

### b.

Citing **Butler v. State**, 55 Md. App. 409, 462 A.2d 1230 (1983), Defendant first argues that immunity from prosecution can only be granted by statute, that the prosecutor lacks "common law" power to grant immunity, and that the legislature did not intend for HRS § 621C-4 to grant immunity from prosecution for perjury prior to the time the testimony is given.

In *Butler*, the Maryland court said, "'[t]here is no inherent, common law power in the State's Attorney or in the Grand Jury or in the judge or in anyone else to confer immunity from prosecution. Immunity is exclusively a creation of statute and can only exist when a statute has brought it into being.'" *Id.* at 418, 462 A.2d at 1234 (quoting **Bowie v. State**, 14 Md. App. 567, 575, 287 A.2d 782, 787 (1972)). That is the universal rule. *Butler;* **Higdon v. State**, 367 So. 2d 991 (Ala. Cr. App. 1979). However, Defendant's reliance on the general rule is misplaced. The quotation from *Butler* only applies to one facet of the issue before us — as in *Butler* — immunity from prosecution based on incriminating statements or evidence.

In *Butler*, Maryland police officers investigating a robbery, having first obtained the approval of the Maryland prosecutor's office, promised the defendant that if he gave them a truthful account of all he knew about the crime, they would not charge him with the offense. However, he was in fact charged. In appealing his conviction the defendant argued that his motion to dismiss, which was based on the police officers' promise, should have been granted. Although holding that the prosecutor could not grant immunity to a defendant for the offense that was being investigated by the police, the *Butler* court noted that the prosecutor had general authority to enter into plea bargains, or other types of bargains with people being investigated for criminal activity. The Maryland court remanded the case, instructing the lower court to make factual findings regarding the nature of the offer made by the

police and the means of enforcing any agreement between the defendant and the police.

*Butler* is important for its discussion of the nature of immunity and the difference between that legal mechanism and the prosecutorial function relating to plea bargains and other decisions not to prosecute a criminal offender.

> We should meticulously keep separate and apart the subjects of (1) the conferral of immunity, (2) a plea bargain, and (3) some other bargain involving something other than a plea to a criminal charge. The sources of authority are different. The social purposes are different. The legal incidents are different. The procedural rules are different. Other than the very general notion of some "*quid pro quo*," the three phenomena are distinct. We only do the law a disservice when we heedlessly blur those distinctions.

*Id.* at 418, 462 A.2d at 1234.

> The very notion of immunity has no existence outside the context of the constitutional privilege against compelled testimonial self–incrimination. It is the "flip–side" of the privilege. "Immunity displaces the [privilege]."

*Id.* at 421, 462 A.2d at 1236 (quoting *Ullman v. United States*, 350 U.S. 422, 439, 76 S. Ct. 497, 507, 100 L. Ed. 511, 525 (1956)).

To support its pronouncement that immunity is granted only by statute, the Maryland court quoted Chief Justice Cardozo who stated for the New York Court of Appeals in *Doyle v. Hofstader*, 257 N.Y. 244, 255, 177 N.E. 489, 495 (1931):

> The conclusion, we think, is inescapable that the power to suspend the criminal law by the tender of immunity is not an implied or inherent incident of a power to investigate. It may be necessary for fruitful results in a particular instance, but it is not so generally indispensable as to attach itself automatically to the mere power to

inquire. Whether the good to be attained by procuring the testimony of criminals is greater or less than the evil to be wrought by exempting them forever from prosecution for their crimes is a question of high policy as to which the law–making department of the government is entitled to be heard.

In contrast to a prosecutor's promise not to prosecute, which has certain attributes of transactional immunity and is not binding on other prosecuting offices in the state or on a successor prosecutor, formal immunity is frequently forced upon a witness against the witness's will and binds all other prosecutors in the same state. Additionally, a grant of immunity confers, under the due process clause, "use and derivative use" immunity against all other states and the United States.[6] *Butler*, 55 Md. App. at 422, 462 A.2d at 1236–37.

In our case, it does not appear that the court in fact granted immunity from prosecution for perjury. When the prosecutor advised the court that the State intended the order to include immunity from perjury, the court neither approved nor disapproved the "grant."[7]

---

[6] For a discussion of the characteristics of use and derivative use immunity and transactional immunity, *see State v. Miyasaki*, 62 Haw. 269, 614 P.2d 915 (1980).

[7] The transcript of the pre–trial conference where the immunity application and grant were discussed indicates that the original intent of the court was that the order would only grant transactional immunity. During that conference, the prosecutor stated that "the State intends to afford immunity for perjury as well." The prosecutor's statement can only be viewed as stating her intent not to prosecute for perjury. It cannot be considered as a construction of the order, since such construction was a matter for the court. *Cain v. Cain*, 59 Haw. 32, 575 P.2d 468 (1978). The court's statements during the conference clearly show that it did not consider the order as granting immunity from perjury. We do not know why the court did not say so.

Regardless, we agree with Defendant that the statute does not grant such authority to the courts. The statute clearly contemplates that the witness will testify truthfully. If the legislature had intended to include immunity from prosecution for perjurious testimony in the grant authorized by HRS § 621C–4, it would not have provided that the witness "may be prosecuted for perjury, [or] for giving a false statement[.]" Moreover, the legislative history of HRS Chapter 621C indicates that it was enacted "to protect a witness by granting him both transactional and use immunity except in a prosecution for an offense arising out of a failure to comply with the direction to testify or produce evidence, or for perjury committed while testifying under the grant of immunity." Hse. Stand. Comm. Rep. No. 483, in 1971 House Journal, at 898. A grant of immunity from perjury prosecution for untruthful testimony is totally destructive of the statute's purpose.

### c.

The court's lack of authority does not, however, resolve the issue of whether the prosecutor had the power to forego any perjury prosecution in this case, for it is equally as obvious that such was her intent. Accordingly, the next question is whether the prosecutor was authorized to render Lester and Martha prospective "immunity" from prosecution for their anticipated false testimony.

> Through his influence over the charging process and his ability to secure an indictment or information, the prosecutor is able to determine when the criminal process will be initiated. His authority to decline to prosecute any given case and his powers to grant immunity and to negotiate pleas allow him to decide when the process shall terminate. The conventional view is that the prosecutor has broad, almost complete discretion in the exercise of these powers.

*A Symposium: Prosecutorial Discretion,* 13 Am. Crim. L. Rev. 379, 379 (1976).

> [The prosecutor] not only has complete discretion as
> to whether to charge, he also has complete discretion as to
> when charges will be filed, what charges will be filed,
> how many charges will be filed, and under what statutes
> the charges will be made.

S. Cox, *Prosecutorial Discretion: An Overview*, 13 AM. CRIM. L. REV. 383, 418 (1976) (hereinafter Cox).

> A proper exercise of [prosecutorial discretion] expedites
> the speedy and efficient administration of criminal justice
> by eliminating cases in which there is little likelihood of
> conviction in early stages of prosecution. It also enables
> the prosecutor to eliminate or defer a criminal prosecu-
> tion as part of a tactical move.

Note, *Prosecutor's Discretion*, 103 U. PA. L. REV. 1057, 1057 (1955).

Our supreme court has recognized that the prosecuting attorney has broad discretion to dispose of criminal charges by agreement, *State v. Fox*, 70 Haw. 46, 760 P.2d 670 (1988); *State v. Yoon*, 66 Haw. 342, 662 P.2d 1112 (1983), and to charge a defendant under one statute or another. *State v. Rabago*, 67 Haw. 332, 686 P.2d 824 (1984).

Some authors believe that limits should be imposed on the prosecutor's exercise of discretion, either internally, through administrative rules or guidelines, or externally. Cox, at 392–93. The American Bar Association (ABA) has developed the following guidelines for the prosecutor's exercise of a discretion not to bring charges:

> The prosecutor is not obliged to present all charges
> which the evidence might support. The prosecutor may
> in some circumstances and for good cause consistent with
> the public interest decline to prosecute, notwithstanding
> that evidence exists which would support a conviction.

Illustrative of the factors which the prosecutor may properly consider in exercising his discretion are:

(i)     the prosecutor's reasonable doubt that the accused is in fact guilty;

(ii)    the extent of the harm caused by the offense;

(iii)   the disproportion of the authorized punishment in relation to the particular offense or the offender;

(iv)    possible improper motives of a complainant;

(v)     prolonged non–enforcement of a statute, with community acquiescence;

(vi)    reluctance of the victim to testify;

(vii)   cooperation of the accused in the apprehension or conviction of others;

(viii)  availability and likelihood of prosecution by another jurisdiction.

*ABA Standards Relating To The Prosecution Function and the Defense Function § 3.9(b) (1971).*

However, the great majority of the courts that have considered challenges to the exercise of prosecutorial discretion have declined to interfere, holding generally that the prosecutor's exercise of authority is free from judicial review under the doctrine of the separation of powers or because of the absence of an adequate record for review and the complex nature of the prosecutor's decision. Cox, at 394.

On the other hand, there is an emerging minority rule regarding judicial review of the prosecutor's decision not to prosecute, generally based on the theory that courts and prosecutors share overlapping responsibilities which allow the court to act when the prosecutor's behavior has been irresponsible or unacceptable. *Id.* at 397.

One court has said: "Of course, prosecutors have broad discretion to press or drop charges. But there are limits." *Dixon v. Dist. of Columbia*, 394 F.2d 966, 968 (D.C. Cir. 1968). In *Dixon,*

the court upheld the lower court's dismissal of a prosecution for a traffic offense that was brought in retaliation for the defendant's filing, contrary to an agreement with government attorneys, a misconduct charge against the arresting police officers. The court refused to be the enforcer of such an "odious" agreement. *Id.* at 969.

In *United States v. Thomas*, 320 F. Supp. 527 (D.D.C. 1970), the court enjoined the United States Attorney from issuing summonses directing defense witnesses to appear at the attorney's office for interviews. The court held that the summonses, which were misleadingly similar to court issued subpoenas, were "offensive document[s]" and "usurpation of judicial power." *Id.* at 529.

We conclude (i) the prosecutor's decision declining to prosecute Lester and Martha for perjury before they had even testified was unacceptable behavior and an abuse of discretion, and (ii) the questions posed to Lester and Martha quoted above were improper and highly prejudicial to Defendant.

Clearly, the prosecutor's reason for foregoing prosecution of Lester and Martha for perjury on account of their trial testimony was a tactical decision. If Lester and Martha thought they would be prosecuted for perjury for their trial testimony, they would not have testified at all. Under those circumstances, the prosecutor would not have been able to get their prior inconsistent statements before the jury, since the prosecutor would be unable to lay the foundation that their prior statements conflicted with their trial testimony. Rule 802.1(1), Hawai'i Rules of Evidence (HRE), HRS Chapter 626 (1985).

As stated, HRS Chapter 621C contemplates that the immunized witness will testify truthfully. Nevertheless, the statute does not command that such witnesses be prosecuted for perjury for not so testifying. Had the legislature intended to mandate prosecution, it would have used language other than the word "may." Conse-

quently, the decision to prosecute or not to prosecute is left to the prosecutor's discretion.

Thus, the prosecutor clearly had authority under the common law to refrain from prosecuting Lester and Martha for their allegedly false testimony after they had testified. However, the prosecutor's actions invited them to testify falsely and advised them that they could do so with impunity. The prosecutor created the opportunity for Lester's and Martha's wilful false oath to tell the truth. The prosecutor's actions did not serve the end of justice and did not encourage Lester and Martha to testify truthfully.

### d.

We turn now to the question whether the prosecutor's questions to Lester and Martha about the grant of immunity from prosecution for perjury amounted to misconduct that deprived Defendant of a fair trial. *See State v. Pemberton*, 71 Haw. 466, 796 P.2d 80 (1990). We think they did.

Without asking the controversial questions, the prosecutor could have impeached Lester and Martha and could have introduced their statements into evidence. *See* Rule 607, HRE. The prosecutor could then have argued to the jury that Lester's and Martha's statements to the police contained the true description of Defendant's criminal acts. The prosecutor could have argued that the jury should not believe Lester's and Martha's trial testimony for the obvious reason that they had changed their minds when confronted with the possibility that Defendant, their son, could go to prison. The jury would have had the witnesses' conflicting statements to compare with other evidence and determine for themselves which statements to believe.

The questions and answers announced to the jury that Lester and Martha had come to the trial with no intention of telling the truth; that they even lied when they took the oath as witnesses. Having asked the questions at issue and obtained the answers, the prosecutor laid the foundation to argue that Lester and Martha had

lied in court not only because of their parental love for Defendant, but also because they had been granted "immunity" from prosecution if they did lie; immunity which the prosecutor had accorded to them.

In our view, the prosecutor's actions unfairly deprived Defendant of any opportunity to argue meaningfully for the credibility of Lester's and Martha's trial testimony and against the credibility of their prior inconsistent statements.

> "The duty of the prosecution is to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused."

*State v. Quelnan,* 70 Haw. 194, 198, 767 P.2d 243, 246 (1989) (quoting *State v. Miller,* 67 Haw. 121, 122, 680 P.2d 251, 253 (1984)).

## 2.

## THE INSTRUCTIONS

### a.

Defendant asserts that the trial court erred in instructing the jury on the law relating to Count I, Robbery in the First Degree. HRS § 708–840(1)(b)(ii).

The essence of Count I was that while Defendant was armed with a dangerous instrument, *i.e.,* the knife, he threatened the imminent use of force against Lester with the intent of obtaining money. The court instructed the jury, *inter alia,* that "[a] knife is a dangerous instrument," and that "[a] threat of imminent use of force is made when a defendant creates circumstances which cause another person present to believe that he may be subject to bodily injury." Defendant did not object to those instructions; however, he now argues that the instructions were plain error.

Rule 30(e), Hawai'i Rules of Penal Procedure (1977) (HRPP), provides that the trial court's erroneous instruction may not be

assigned as error on appeal unless the party alleging the error objected to the instruction before the jury retired. However, the alleged error may be considered by the appellate court where it is plain error or a defect affecting substantial rights. Rule 52(b), HRPP. Plain error is error that is obvious or otherwise seriously affects "'the fairness, integrity, or public reputation of the judicial proceedings.'" *Fox*, 70 Haw. at 56, 760 P.2d at 676 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S. Ct. 391, 392, 80 L. Ed. 555, 557 (1936)) (citations omitted).

Defendant had the substantial right in this case to have the jury correctly instructed in order to insure that the jury was properly guided in its consideration of the issues presented to it. *State v. Feliciano*, 62 Haw. 637, 618 P.2d 306 (1980). In our view, the instructions complained of constituted plain error.

### b.

HRS § 708–840(2) (Supp. 1992) defines a "dangerous instrument" as "any firearm, . . . or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury." By that definition, a knife is not a dangerous instrument unless the manner in which it is used or threatened to be used renders it capable of producing death or serious bodily injury. When the court told the jury that a knife is a dangerous instrument, it misstated the law and took the question of the knife's use from the jury. *State v. Napeahi*, 57 Haw. 365, 556 P.2d 569 (1976). This was especially prejudicial to Defendant in view of Lester's and Martha's trial testimony that Defendant was merely waving the knife around and not holding it against Lester's throat as they had indicated in their statements to the police.

The State's argument that the divergence from the statute in this case was not error because, unlike the *Napeahi* court, the court here did not instruct the jury that a knife is a dangerous instrument

*as a matter of law*, is not persuasive. Here, the jury was instructed on the elements of the offense and was told that the State had to prove each element beyond a reasonable doubt. One of those elements was that Defendant was armed with a dangerous instrument. The clear effect of the offending instruction was to tell the jury that the State had already proved that element beyond a reasonable doubt.

### c.

The instruction defining the imminent use of force requires us to construe HRS § 708–840. In doing so, it is our duty to determine the legislature's intent primarily from the language of the statute. *State v. Briones*, 71 Haw. 86, 784 P.2d 860 (1989).

Robbery is an aggravated form of theft. *See* Commentary on HRS §§ 708–840 and –841 (1985). The legislature has treated it more seriously than ordinary theft because of the risk of bodily harm to the victim. *Id.* Since the statute states that robbery involves the threat of "imminent use of force" against someone who is "present," it necessarily follows that the legislature intended the threat to be of imminent bodily harm. An instruction, such as the one here, that allows the jury to erroneously conclude that the threat may be of future bodily injury incorrectly states the law.

### CONCLUSION

Accordingly, we reverse the judgment of conviction on Count II, vacate the judgment of conviction on Counts I and III, and remand those latter counts for further proceedings.

*Brook Hart* (Hart & Wolff, of counsel) on the briefs for defendant–appellant.

*Doraine F. Meyer*, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief for plaintiff–appellee.