James William KERNS, Appellant
(Defendant),

v.

The STATE of Wyoming
Appellee (Plaintiff).

No. 95–94.

Supreme Court of Wyoming.

June 25, 1996.

Sylvia Lee Hackl, State Public Defender; Deborah Cornia, Appellate Counsel, Cheyenne, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Sr., Assistant Attorney General; Kimberly A. Baker, Assistant Attorney General, Cheyenne, for Appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR, and LEHMAN, JJ.

GOLDEN, Chief Justice.

Appellant James William Kerns appeals his conviction and sentence for first degree murder. His appeal challenges jury selection, witness immunity, failure to disclose evidence, hearsay, and various prosecutorial actions during trial.

We affirm.

## ISSUES

Kerns presents these issues:

1. Did the trial court deny the Appellant his constitutional right to a fair and impartial jury when it abused its discretion during the jury selection process by requiring the Appellant to use a peremptory challenge on a biased jury member?

2. Did the prosecutor improperly grant immunity from prosecution to a material witness against the Appellant?

3. Was Appellant denied his constitutional right to confront a material witness against him?

4. Did prosecutorial misconduct deny Appellant a fair trial as guaranteed by the due process clauses of the United States and Wyoming Constitutions?

5. Did the trial court err when it admitted, over objection, the hearsay testimony of Officer Raitz?

6. Was the cumulative effect of the errors discussed above such that the Appellant was denied his right to a fair trial and substantial justice?

The State summarizes the issues as:

Whether appellant was denied his right to a fair trial?

## FACTS

On September 5, 1993, two fishermen discovered the body of Jose Henriquez 500 yards from the Sacajawea Campground near Big Piney. He had been beaten and stabbed once in the chest. Henriquez had last been seen on August 22, 1993, at the Silver Spur Bar in Big Piney. Henriquez, a Mexican national working for a company named Ranko in Sublette County, was reported missing by his employer on August 23, 1993.

After discovery of the body, the area was searched and witnesses were interviewed without result. Almost seven months later, on March 11, 1994, Casper resident Debar Green contacted the Sublette County Sheriff's Department and reported that she had information on a murder in Big Piney. In an interview by Division of Criminal Investigation agents in Casper, Green stated that her recently estranged boyfriend, James Kerns, told her he had killed a Mexican in Big Piney. Henriquez had approached Kerns in the Silver Spur Bar to buy drugs. Kerns saw that Henriquez had a substantial amount of cash, went home and took his roommate's knife and drove Henriquez to the mountains where he stabbed, kicked and robbed him.

At the time of the murder, Kerns had been living in Big Piney with Kenneth Lord. Lord, who has felony convictions for burglary, kidnapping, forcible rape with a knife, drug violations and aggravated assault, made numerous statements to the police during the course of their investigation. Eventually, under what the State characterizes as an agreement with the prosecutor not to exercise his discretion to prosecute, Lord testified that Kerns confessed to robbing and killing Henriquez with Lord's knife.

Witnesses placed Kerns in the Silver Spur Bar the night Henriquez disappeared and experts testified that dog hair found on Henriquez' pants and in Kerns' vehicle were similar in some respects. Although Lord testified that Kerns' dog was with Kerns the night he killed Henriquez, the State did not take hairs from the dog for comparison.

Kerns introduced alibi evidence in his defense to the charge. Kerns and several witnesses testified that the day before the murder (Saturday), Kerns left Big Piney, moved to Casper and began work the following Monday. Kerns denied any involvement in the murder and robbery of Henriquez. The jury returned a verdict of premeditated and felony murder and Kerns is presently serving a mandatory life sentence.

## DISCUSSION

*Jury Selection*

Kerns claims the trial court abused its discretion in denying a challenge for cause against a prospective juror. The venireperson was a cousin to a witness in the case and expressed concerns about drug dealer testimony. Defense counsel later exercised a peremptory challenge on the venireperson and objected to the jury panel as empaneled.

The test to be applied in determining whether a prospective juror should be dismissed for cause is whether that person would render a fair and impartial verdict based on the evidence presented at trial and the instructions given by the court. *Munoz v. State*, 849 P.2d 1299, 1302 (Wyo.1993). Whether a juror is biased is a question of fact for the trial judge. *Jahnke v. State*, 682 P.2d 991, 1000 (Wyo.1984). A trial judge's decision will only be reviewed for an abuse of discretion. *Munoz*, 849 P.2d at 1302. The failure to challenge a juror, and then later acceptance of the panel at trial, waives any objection to the service of a particular juror. *Id.* To establish reversible error, Kerns must show that he did not accept the jury and that he was prejudiced by a denial of a right to a peremptory challenge because he was forced to exercise it against another juror, and that he exhausted his peremptory challenges. *Id.* In this case, Kerns has properly preserved this issue for appeal.

The venireperson in question requested to be heard in chambers where he expressed concern in two areas: whether he could draw on personal experience to evaluate the truthfulness of the witness, his cousin; and whether any testimony would come from a drug dealer. In response, the trial court informed the juror that nothing prevented a juror from knowing a witness if the juror judged that witness's credibility based on the evidence at trial. When asked, the juror agreed that he could judge the witness's credibility based on trial evidence. The defense's challenge for cause was denied, the court noting the statute only permitted challenges to relatives of the parties and stating:

the vast majority of the people on this jury panel have acquaintanceship with [this witness]. He's going to be well known to a number of the people[,] whichever 12 people are on this jury, and that's just the way it is. This is a small county and a small

community. People know each other, and the challenge is denied.

The defense then questioned the prospective juror about his concern with drug dealer testimony. The juror's statements revealed little more than that he believed that the fact the witness was a drug dealer would certainly bear on credibility. The court denied the defense's challenge for cause on this basis. When the defense challenged the empaneled jury, the court again denied, noting that two full days had been devoted to jury selection from fifty-one prospective jurors and that he had permitted an extensive and permissive voir dire by the defense. Numerous in-chamber inquiries into sensitive areas had been held resulting in many dismissals for cause.

 Our review of the record indicates that the trial court did conduct a thorough voir dire and jury selection process, consistently dismissing those prospective jurors who felt they could not determine a verdict strictly from the evidence. Even from a cold record, it is clear that voir dire was conducted in an atmosphere which encouraged openness and honesty, but fully explored whether a juror's perceived bias actually would prevent rendering a fair and impartial verdict, all without coercion by the trial court. In the case of the particular juror in question, the trial court remained consistent in its manner of inquiry and elicited answers which satisfied the court that the juror did not have a bias or prejudice either because a witness was a relative or because drug dealers would testify which would prevent that prospective juror from rendering his verdict on the evidence. It is not error for a judge to take steps to make a prospective juror understand that a supposed bias will not be grounds for successful challenge for cause if the prospective juror is able to consider the case only on the evidence presented in court under the law as instructed by the court. *Gresham v. State*, 708 P.2d 49, 56 (Wyo.1985). It is the trial court's prerogative to give considerable weight to a potential juror's statement that the juror could fairly and impartially serve on the case. *See Schwenke v. State*, 768 P.2d 1031, 1033 (Wyo.1989); *People v. Robinson*, 874 P.2d 453, 457 (Colo.App.1993). We find no abuse of discretion.

*Witness Immunity*

After Division of Criminal Investigation (DCI) agents had conducted several unproductive interviews with Kenneth Lord, he and the prosecutor entered into a written agreement which read as follows:

This letter is intended as a memorandum of our agreement that the State of Wyoming will not prosecute Ken Lord for crimes committed or alleged to have been committed in Sublette County with reference to the murder on or about August 23, 1993, of Jose Henriquez. This agreement is made upon the condition that Mr. Lord cooperate fully with the investigators in the matter and testify to those matters elicited from him in the investigation and contained in his statement.

It is our understanding that Mr. Lord was not directly involved in the homicide and has information which has been discussed in my presence and which, combined with other information, tends to prove that the homicide was committed by the man presently charged with the same, James William Kerns.

Kerns contends that any grant of immunity not authorized by statute is improper and requires reversal. The State characterizes the agreement as an agreement within the prosecutor's discretion not to prosecute rather than a grant of immunity.

 "A prosecuting attorney, solely by virtue of his office and in the absence of any statutory authorization, has no power to grant immunity to a witness." *Hall v. State*, 851 P.2d 1262, 1266 (Wyo.1993). In the case of an accused, this Court has held that the absence of authority to extend immunity will not make the agreement unenforceable. The accused may seek enforcement on due process grounds as he was induced to incriminate himself as a result of an unauthorized promise. *Hall*, 851 P.2d at 1267; *Russell v. State*, 851 P.2d 1274, 1277–78 (Wyo.1993).

Judicial decisions have recognized the difference between immunity grants and prosecutorial decisions not to prosecute a criminal offender either by plea bargaining or other agreement. *State v. Radcliffe*, 9 Haw.App.

628, 859 P.2d 925, 931 (1993) (citing *Butler v. State*, 55 Md.App. 409, 462 A.2d 1230, 1234 (1983)). In Wyoming, a prosecutor generally has no power to grant immunity to a witness, but has authority to enter into plea bargains or other types of bargains with people being investigated for criminal activity. *Gale v. State*, 792 P.2d 570, 587 (Wyo.1990). The difference has been explained as follows:

> In contrast to a prosecutor's promise not to prosecute, which has certain attributes of transactional immunity and is not binding on other prosecuting offices in the state or on a successor prosecutor, formal immunity is frequently forced upon a witness against the witness's will and binds all other prosecutors in the same state.

*Radcliffe*, 859 P.2d at 931.

 Regardless of the characterization given the agreement, Kerns cannot challenge it since this Court has previously held that a defendant has no standing to contest the state's grant or withdrawal of immunity to a state's witness, *Dean v. State*, 865 P.2d 601, 612 (Wyo.1993), absent a showing of improper coercion or tainted testimony arising from the grant of immunity. *Rivera v. State*, 846 P.2d 1, 7 (Wyo.1993). A prosecution agreement was addressed in *Gale* in response to a due process challenge. *Gale*, 792 P.2d at 587. There, we noted that prosecution agreements are not per se illegal and are generally upheld on the premise that juries, not appellate courts, should determine the credibility of witnesses who are party to prosecution agreements. *Id.* Having the power to enter into this type of agreement, the prosecutor did not act improperly simply in doing so.

*Brady Error*

During jury deliberations, the defense learned that the State's primary witness against Kerns, Debar Green, had been arrested in order to secure her presence at trial. The defense moved for a mistrial, but the jury returned with its verdict before a ruling was made.

 On appeal, Kerns contends this is denial of confrontation and denial of his right to exculpatory evidence mandated by *Brady*

*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The State views it as only a *Brady* issue and contends that any nondisclosure was not material to guilt or innocence. Under other theories, Kerns also contends that the prosecution suppressed other evidence favorable to his defense. *Brady* requires the State to disclose "evidence that is both favorable to the accused and 'material either to guilt or punishment.'" *Engberg v. Meyer*, 820 P.2d 70, 77 (Wyo. 1991) (quoting *United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985)). Impeachment evidence, like exculpatory evidence, is within the *Brady* rule and must be disclosed if material. *Engberg*, 820 P.2d at 77 (citing *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380). No specific request is required for disclosure of impeachment evidence. *Engberg*, 820 P.2d at 77. The failure to disclose evidence found to be material requires reversal of a conviction. *Id.*

> [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Engberg*, 820 P.2d at 77 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383). Recently, in *Kyles v. Whitley*, — U.S.—, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the United States Supreme Court restated the standard for determining materiality under *Bagley*, emphasizing the following four aspects:

> 1) A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. *Kyles*, — U.S. at —, 115 S.Ct. at 1566.

*Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reason-

ably probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial." *Id.*
2) This standard is not a sufficiency of evidence test and does not mean that a defendant is required to show that the undisclosed evidence would have rendered the evidence as a whole insufficient to support a conviction, or that if timely disclosure had been made, acquittal would have been certain, but the undisclosed evidence will be deemed material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*
3) A harmless error analysis is not applicable once a *Bagley* error is found. *Id.*
4) Finally, a reviewing court is compelled to consider the suppressed evidence "collectively, not item-by-item." *Id.* at ——, 115 S.Ct. at 1567.

■ Accordingly, we review the collective effect of all suppressed evidence alleged in this case. In the context of a *Brady* challenge, materiality is a mixed question of law and fact and a reviewing court should conduct an independent examination of the record in determining whether the suppressed evidence is material. *United States v. Payne*, 63 F.3d 1200, 1209 (2nd Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

### 1. Witness' Arrest

At trial, the defense portrayed Green as a vindictive liar during its cross-examination of Debar Green. To demonstrate her vindictiveness, the defense revealed that Green had been imprisoned for punishing her six-year-old daughter by burning her hand. To demonstrate her motive for vindictiveness, it was brought out that Green's parole had been revoked in part because of Kerns, the two had numerous violent fights, Kerns had failed to answer letters she wrote while in prison and, on the day she phoned the sheriff, she and Kerns had ended their relationship because Kerns had discovered Green was having an affair. The defense claims the information that law enforcement arrested Green because she was attempting not to

testify was also critical impeachment evidence on the issue of her credibility since it indicates she did not want to lie on the witness stand. The State claims there was no suppression of exculpatory or favorable evidence since the arrest was included in the court file although not served on the defense. At an evidentiary hearing, the defense did not produce any evidence that Green was concerned with perjuring herself. Witnesses called by the defense did state that Green told them she was receiving threats from Kern's friends in Casper. Green did not testify at the evidentiary hearing.

■ The credibility of Green may have been determinative of guilt or innocence and nondisclosure of evidence affecting her credibility falls within the general *Brady* rule. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). When witness credibility is an issue, evidence bearing on credibility may be admissible. The defense's assertion that Green's arrest was impeachment evidence, however, is unsupported by evidence in the record and speculative. The failure to disclose Green's arrest is not constitutional error and its materiality will not be discussed.

### 2. Physical Evidence

■ Before trial, the defense became aware that physical evidence, dog hair, sent to a criminal analysis laboratory was lost by the postal system. The prosecutor did not disclose the loss to the defense, but the defense learned of the loss before trial and filed a motion in limine requesting exclusion of all evidence concerning the hair. Following a pre-trial hearing, the district court denied the motion, finding the evidence was not exculpatory. Our review of the record indicates that dog hair was found on the pants of the murder victim and in Kerns' truck. In an attempt to link this physical evidence to Kerns, the prosecution had crime laboratories compare the two samples. During trial, the State's own expert indicated this kind of comparison was of dubious value; however, no evidence indicated that the defense planned analysis of the dog hair by its own expert and no evidence exists that shows a defense expert's opinion would have pro-

duced exculpatory evidence. The failure to disclose the loss of this physical evidence was not constitutional error and its materiality need not be discussed.

### 3. Witness Identification

 Before trial, defense counsel became aware that the DCI agent investigating the murder had shown a witness an eight-man photo lineup which included Kerns. The witness, Kelly Wilson, was in the Silver Spur Bar on the date of the murder. Other witnesses had placed Kerns at the bar on the date of the murder and testified that Kerns was playing pool with the victim. Wilson told the agent she recognized Kerns but that he was not in the bar on the night of the murder. The agent told Wilson that her testimony would not be needed and did not issue a report concerning this exculpatory evidence. The defense contends this was relevant and exculpatory but was not revealed to the defense by the State. An "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" and is responsible for disclosing known, favorable and material evidence. *Kyles*, —— U.S. at ——, 115 S.Ct. at 1567–1568. Information that this defendant was not in the Silver Spur Bar or in Big Piney on the Sunday that the victim was last seen was favorable evidence. This information should have been furnished to Kerns pursuant to *Brady* and *Bagley* and its materiality will be considered. In this case, disclosure of the suppressed evidence to competent counsel would not have made a different result reasonably probable. Two weeks before trial, the defense learned of Wilson's statement to DCI and she did testify. The prosecution's failure to disclose it does not undermine confidence in the verdict. There was no *Brady* error in this trial.

### Confrontation of Witness

 Kerns argues that because the State failed to disclose Green's arrest, his Sixth Amendment right to confront the witnesses against him was violated. On a similar claim, the United States Supreme Court decided that because the trial court had not made a direct ruling restricting the scope of cross-examination, the claim was properly analyzed in the *Brady* context, stating:

> The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination.

*Bagley*, 473 U.S. at 678, 105 S.Ct. at 3382.

In this case, the trial court did not make a direct ruling restricting cross-examination. The constitutional error, if any, was the prosecutor's failure to disclose, which is a due process issue and not a confrontation issue. We analyzed the due process issue above and found no error.

### Prosecutorial Misconduct

Kerns contends that tactics employed by the prosecution denied him a fair trial. He specifies the following:

1. a third preliminary hearing resulting in a first degree murder charge following the prosecution's two dismissals of charges after earlier preliminary hearings bound him over on second degree murder charges;

2. failure to disclose Wilson's statement, Green's arrest, and loss of the hair samples;

3. unlawful grant of immunity to Kenneth Lord;

4. failure to inform defense until the end of opening statements that the prosecutor intended to introduce evidence from Lord that he bought drugs from Kerns between the time of the murder and Kerns' arrest.

The second and third incidents have already been addressed and found not to have violated due process.

 Kerns' only argument in support of his contention that the dismissals and refiling is a denial of a right to a fair trial is that this approach set a tone of obtaining a first degree murder conviction at all costs. Following two preliminary hearings, the justice of the peace was disqualified. The State dismissed charges and refiled against Kerns before another justice of the peace. The State contends that immediate dismissal by the State was necessary to stop the speedy

trial clock. It further asserts that WYO. R.CRIM. P. 48 grants prosecutors the discretion to dismiss and refile charges against a defendant, assuming there will be no resulting prejudice. We agree with the State that Kerns' mere recitation that the dismissals and refiling occurred does not show prosecutorial misconduct.

Finally, no prosecutorial misconduct is demonstrated from the fourth incident listed above. After opening statements, the prosecution requested an in-chambers hearing on the defense's motion in limine dealing with the defendant's drug use. At that time, the prosecutor informed the court that the State wished to present evidence that sometime after the murder Lord traveled to Casper to purchase drugs from Kerns. The defense objected on grounds it had not heard about drug dealing previously and the proposed evidence was irrelevant and unfair surprise. Using the analysis of *Dean v. State,* 865 P.2d 601 (Wyo.1993), the district court determined that the proffered evidence was relevant since the defense's opening statement characterized the purpose of this trip as a meeting between Lord and Green about the murder. It ruled this evidence was relevant to tell the complete story. Defense counsel argued that had he known of this evidence, his opening statement might have been different. Defense counsel then moved to reopen his opening statement to inform the jury of the new evidence in order to remove prejudice caused by the late disclosure. For this reason, the district court permitted defense counsel to reopen his statement and address the issue. Kerns claims that reopening his statement did not cure any prejudice caused by the late disclosure.

The record reveals that in its opening statement the defense claimed that Green had, in part, gained her knowledge about the murder from Lord, specifically referring to an instance when Green and Lord were seen whispering together at Kerns' home and implying the two were discussing the murder. All acknowledge that Lord made numerous statements concerning his knowledge about the murder and, very close to trial, Lord disclosed for the first time in his fifth statement that he was visiting Kerns and Green in Casper to purchase drugs from Kerns. The district court ruled this testimony was admissible under an exception to Rule 404(b) and the prosecution was entitled to present it. The district court further ruled that Lord could be cross-examined concerning his latest disclosure, finding that it was relevant to weight, not admissibility. We find nothing in the record that prosecutorial misconduct caused this sequence of events; the district court ruled properly on admission and scope of cross examination.

*Hearsay*

During its case-in-chief, the State called Deputy Sheriff Randy Raitz to testify. Deputy Raitz assisted in securing the area around the campground where Henriquez' body was found. Raitz testified about his observations of the crime scene and body and his participation in two area searches for evidence in connection with the murder. Raitz testified that his next connection with the case was on March 11, 1994, when he received a phone call from Debar Green. Over the objection of defense counsel, Raitz then related everything Green said in two phone conversations. Outside the jury's presence and in response to defense's motion for mistrial, the district court ruled that this information was not hearsay because it was not offered for the truth of the matter, but offered for the fact that it was made at that time. Kerns contends it is hearsay and reversible error.

The State relies on *Olson v. State,* 698 P.2d 107, 113–14 (Wyo.1985) where this Court ruled similar information was not hearsay. In *Olson,* a highway patrol officer stated that several truck drivers reported that the defendant's vehicle was driving erratically. The officer followed the vehicle, and when it weaved and hugged the side of the road, stopped it and found cause to arrest Olson for driving under the influence. At trial, Olson challenged whether probable cause existed to stop Olson. The *Olson* decision held that the district court properly ruled the truck driver reports were not hearsay because they were not offered to show the truth of the matter but to show the officer's good faith and reasonable belief in the pro-

priety of the action taken; at the defense's request, the court properly issued a limiting instruction. *Olson*, 698 P.2d at 113–14. The *Olson* decision, however, restricts the application, stating:

[T]he witness is limited to a statement that he took a particular action as a result of the information received and that it is not proper to allow the witness to testify concerning the conclusions of the informer that the defendant was guilty of a crime ... [and] conclusions of any informer as to the present defendant's involvement in the crime.

*Olson*, 698 P.2d at 114 (quoting *State v. Turner*, 392 So.2d 436, 440–41 (La.1980)).

Raitz testified that he received two phone calls from a woman who claimed she had information about the homicide. In response to the prosecution's question about "what was said in that conversation," Raitz testified that Green told him:

And I asked her about the name of the person who had committed this murder and she advised me that it was James William Kerns. That he was a boyfriend of hers; that he was living up in Casper and that she was really afraid of him; that he was using this information against her.

\* \* \* \* \* \*

Again, I asked Debbie to describe what she knew about this homicide and why she had this information, and she advised me that the person, this Indian, what she considered it an Indian male had been killed by being stabbed once in the chest and kicked several times in the head. I again asked her how she found this out. And she stated it was from James William Kerns the person who had told her about it and that he was using this information to hold some type of restraint on her.

McCORMICK ON EVIDENCE § 249 notes that some out-of-court utterances are not hearsay, including:

one area of apparently widespread abuse [which] should be noted. In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient.

It goes on, however, to state:

Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.

2 JOHN WILLIAM STRONG, McCORMICK ON EVIDENCE § 249, p. 104 (4th ed.1992).

In this case, Raitz' testimony as to the contents of the conversation was hearsay and was unnecessary to explain his investigatory actions. *People v. Pryor*, 181 Ill. App.3d 865, 130 Ill.Dec. 812, 816, 537 N.E.2d 1141, 1145 (2 Dist.1989); *see Longstreth v. State*, 832 P.2d 560, 563 (Wyo.1992). A nonconstitutional error in admission of evidence is harmless when a defendant's substantial rights are not affected. WYO. R.CRIM. P 52(a); *Campbell v. State*, 589 P.2d 358, 368 (Wyo.1979). The proper inquiry is whether a reasonable probability exists that, but for the error, the verdict would have been more favorable to the defendant. *Talbott v. State*, 902 P.2d 719, 721 (Wyo.1995). Kerns claims that the officer's testimony added credibility to Green's testimony and, since her credibility was crucial to the prosecution's case, was prejudicial and reversible error. Because Green did testify later that she made these statements in the conversation and was extensively cross-examined by defense about her entire testimony, there is no reasonable probability that excluding this hearsay evidence would have led to defendant's acquittal. Admission of Officer Raitz' testimony about the substance of the conversation between Raitz and Green, although error, was harmless.

*Cumulative Error*

Finding only one instance of harmless error in his trial, we do not consider Kern's cumulative error argument.

Affirmed.