**UNITED STATES of America**

v.

**John ELLIS, Appellant in No. 78–1555 (D.C. Crim. No. 77–00428–01)**

**James Carty, Appellant in No. 78–1556 (D.C. Crim. No. 77–00428–02)**

**James Curley, Appellant in No. 78–1557 (D.C. Crim. No. 77–00428–03)**

**William Jones, Appellant in No. 78–1558 (D.C. Crim. No. 77–00428–04)**

**James Crown, Appellant in No. 78–1559 (D.C. Crim. No. 77–00428–05)**

**Roseborough McMillan, Appellant in No. 78–1560 (D.C. Crim. No. 77–00428–06).**

**Nos. 78–1555 to 78–1560.**

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1978.

Decided March 13, 1979.

---

A. Charles Peruto, Burton A. Rose (argued), Peruto, Ryan & Vitullo, Philadelphia, Pa., for appellants.

Peter F. Vaira, U. S. Atty., John F. Penrose, Asst. U. S. Atty., Chief, Crim. Div. (argued), James D. Coleman, Asst. U. S. Atty. (argued), Philadelphia, Pa., for appellee.

Before GIBBONS, Van DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

The appellants, six members of the Homicide Bureau of the Philadelphia Police Department, appeal from judgments of sentence following their conviction by a jury of conspiracy to deprive Philadelphia residents of federal civil rights in violation of 18 U.S.C. § 241. We affirm.

## I. THE FACTS

Sometime in the mid-1970's Radamas Santiago purchased a home at 4419 North 4th Street in the Feltonville section of Philadelphia. The Santiagos had difficulties with some of their new neighbors. In late September, 1975, the Santiago car was firebombed. A few days later, on October 5, 1975, at 3:25 a. m., while the Santiagos were asleep in their home, their house was firebombed. Radamas and one of his sons, Carlos, survived. Radamas' wife, three of his children, and Luis Caracini, a guest in the house, perished in the fire. The six appellants, along with other Philadelphia police officers, were assigned to investigate this arson murder.

Sleeping on the front porch of the Santiago home when the house was firebombed was Nelson Garcia, a fourteen year old Puerto Rican boy, a friend of the Santiagos. His hair aflame, Garcia fled from the house, looking for a fire alarm. Garcia saw one Robert Wilkinson in an automobile stopped near the Santiago home. Because Wilkinson was the first person he saw, Garcia assumed, contrary to fact, that Wilkinson

had started the fire. When the investigating Philadelphia police officers interviewed him, Garcia accused Wilkinson, who was promptly arrested. Admitted to Temple University Hospital, Garcia was questioned further, and elaborated that he had seen Wilkinson throw a bottle with a burning cloth onto the Santiago porch. Wilkinson was taken to the Philadelphia Police Administration Building (PAB), where he was questioned by several of the defendants. Eventually he signed a confession to a crime which he did not commit. Wilkinson was tried and convicted in the Philadelphia Common Pleas Court on five counts of murder. Garcia was the only alleged eye witness to testify, falsely, against him. Garcia had been influenced to do so by hearing that Wilkinson had confessed. Eventually the person who actually had thrown the firebomb, David McGinnis, acknowledged his guilt. Wilkinson's conviction was reversed, after he had spent fifteen months in jail.

An investigation by federal authorities into the efforts of these six Philadelphia police officers to procure the evidence which led to that conviction resulted in their indictment for conspiracy, under color of Pennsylvania law, to injure, oppress, threaten, and intimidate Robert Wilkinson, Ronald Hanley, David McGinnis, John McCandless, Vincent Cucinotta, Christine Wilkinson and Judith Cucinotta in the enjoyment and exercise of rights secured to them by the Constitution and laws of the United States. The named victims of the conspiracy are all persons whom the Philadelphia Police subjected to detention and coercive interrogation in their effort to build a case against Wilkinson. The evidence presented by the government suggests that the methods of investigation used by the defendant homicide detectives were as barbaric as they were misdirected. With respect to each victim of the conspiracy the jury could have found as outlined below.

## A. *The Wilkinsons*

Wilkinson was twenty-five years old. He had attended special classes for slow learners throughout his education, which ended at age sixteen, and was essentially illiterate. He arrived at the PAB with his wife, Christine, shortly after 5:00 a. m. They were separated and both were detained. He was placed in a small windowless interrogation room, containing a bolted-down steel chair. Defendants Jones and Crown questioned him about the firebombing, and he denied having anything to do with it. He told the detectives that he and his wife had been out celebrating their anniversary, and that he first saw the fire upon returning from an errand to get cigarettes for her. He immediately drove around the corner and set off a fire alarm. After Wilkinson had gone over his statement four or five times, maintaining his innocence throughout, defendants Jones and Crown were joined in the interrogation room by defendant McMillan. The latter told Wilkinson that there were three or four counts of murder against him and that the police had an eyewitness. McMillan then punched Wilkinson in the chest. As Wilkinson fell to the floor from the blow, McMillan, who then weighed over three hundred pounds, slapped him across the side of his face with tremendous force. As McMillan left the room, he said to Jones and Crown that if they needed him he would return and deliver a punch which would stop Wilkinson's heart.

After McMillan's departure, Crown and Jones demanded that Wilkinson execute a form consenting to a polygraph test. Since he could not read, Wilkinson asked that his wife be allowed to read it. Crown and Jones refused, and threatened to take away the Wilkinsons' five month old child if he did not sign. Finding that threat credible, he signed.

Wilkinson was taken to a polygraph room in the basement of the PAB. Throughout the polygraph test he continued to maintain his innocence. After the test, however, Crown and Jones began a systematic beating in an effort to coerce a confession from Wilkinson which would confirm Garcia's false eyewitness identification. Although he continued to maintain his innocence during the early stages of the beating, eventu-

ally Wilkinson's resistance crumbled, and at 11:05 a. m. he signed a confession to a crime he did not commit.

In the confession Wilkinson supplied details which he could not have known. He said that the firebomb which he threw had been made from a Maxwell House coffee jar and a burning wick.[1] Wilkinson confessed that one Ronald Hanley supplied the bomb, and that the instigation to throw it came from Hanley and two other men.

Corroboration of Wilkinson's severe beating was furnished by a prison doctor and a guard, who saw his injuries, by prison photographs of abrasions and cuts, and by neighbors who attended his arraignment in the courtroom at the PAB and observed that he could hardly walk without assistance.

### B. *Hanley*

Ronald Hanley, the man whom Wilkinson's coerced confession implicated, was a Democratic Committeeman in the Santiagos' neighborhood. He was arrested and brought to the PAB with David McGinnis, a neighborhood youth, around 8:00 a. m. on October 5. Those arrests did not result from any information obtained from Garcia or Wilkinson, but from information obtained from a neighborhood resident implicating the pair in the firebombing of the Santiago automobile ten days earlier. Thus Hanley, like Wilkinson, came to the PAB as a prime suspect. When questioned, however, he initially denied knowledge about the firebombing of the house. He was then taken to the polygraph room for testing, and again maintained his innocence.

About 11:00 a. m. Hanley was returned from the polygraph area to an interrogation room where he was interrogated by defendants Ellis, Carty, Curley and an unidentified co-conspirator. Hanley was subjected to a prolonged series of beatings during which his nose was lacerated. In one instance a kick or punch caused him to lose control of his bowels. He was made to sit in his soiled clothing for close to an hour before being taken to a rest room and allowed to clean himself.[2] The interrogation followed the well known "Mutt and Jeff" routine in which one officer (Kuhar) would ask questions in a relatively friendly manner, and the others would, if he was unsuccessful, return and administer physical punishment. At 10:45 p. m. on October 5, almost fifteen hours after he had arrived at the PAB, Hanley signed a four page confession which tied in neatly with that obtained from Wilkinson some twelve hours earlier. To the extent that it admitted participation in the firebombing of the Santiago house, the confession was true. But it confirmed that Hanley had supplied the firebomb to Wilkinson. This was false, for Wilkinson was a non-participant, and David McGinnis had actually thrown the bomb.[3]

Corroboration of Hanley's several beatings was supplied by prison photographs showing abrasions and cuts and by a prison doctor who opined that he had suffered a trauma to his chest which resulted in a spot on a lung x-ray taken shortly after he was jailed.

### C. *McGinnis*

David McGinnis, too, arrived at the PAB as a prime suspect because of the information the police had received about the burn-

1. Although Garcia was unable to describe the firebomb when questioned by detectives at noon on October 5, ten days later he was able to describe it to virtually the exact measurements of a Maxwell House coffee jar.

2. While in the rest room he threw his undershorts in the trash. That action was to provide a corroborative detail, since several hours later warrants were issued for the seizure of the clothing of Hanley and Wilkinson in order to test for vapors of petroleum distillate. Wilkinson's, but not Hanley's underwear was seized.

3. State charges against Hanley were dismissed because the Commonwealth was unable to move its case against him within 180 days of his arrest. Hanley was later indicted by a federal grand jury for violating 18 U.S.C. §§ 844(b), 371, 2(a) and 1510, 26 U.S.C. §§ 5861(f) and (d), and 42 U.S.C. § 3631. His conviction was affirmed by this court. *United States v. Hanley,* 588 F.2d 824 (3d Cir. 1978).

ing of the Santiago car. During his interrogation he was beaten by Carty and by McMillan. On October 5, he signed a confession that he had, with Hanley, firebombed the Santiago automobile. He did not, however, admit to any role in the firebombing of the Santiago home.

Many months later, after Wilkinson had been convicted of murder in Pennsylvania Court of Common Pleas, McGinnis confessed. He pleaded guilty to federal charges growing out of the firebombing conspiracy and was sentenced to twenty-two years incarceration. McGinnis testified in the federal trial of Ronald Hanley, and in this trial, that he and Hanley had conspired to torch the Santiago home, and that he had actually thrown the bomb.

## D. *The Cucinottas*

Vincent and Judith Cucinotta lived across the street from the Santiagos. They were brought to the PAB by a Philadelphia detective about noon on October 5, apparently because the police had information about altercations between members of the Santiago and Cucinotta households. They were separated immediately on their arrival. Vincent Cucinotta was questioned about gasoline he kept in his garage. Later he was polygraphed. Following the polygraph he was administered a series of beatings by a detective he believed was McMillan. Cucinotta's identification of McMillan was not positive, but McMillan was positively identified as a beater of Wilkinson and McGinnis, and was the one of two black detectives involved in the interrogation: the larger of the two.[4]

Judith Cucinotta was an eye witness to the firebombing. Looking out her window she had seen Hanley hand the bomb to McGinnis. She did not disclose this information to the police on October 5.[5] When she was separated from her husband she

was interrogated by a detective about whether she and Nancy McCandless had siphoned gasoline from a car. She maintained her own innocence, and denied any knowledge of who was involved. After being subjected to a polygraph test, she was threatened by a detective with being put in "State Road for 30 days where she would be held with a bunch of lezzies and queers." The detective also threatened to take her children away and place them in an orphanage with Puerto Ricans, who would kill them. She was also threatened with a visit to the morgue to look at the burned Santiago bodies. She never, on October 5, gave an incriminating statement, or one implicating Hanley and McGinnis. She was detained at the PAB until after Hanley gave a false statement implicating Wilkinson.

Judith Cucinotta provided corroboration of the abusive interrogation of two other victims, Wilkinson and McCandless, whom she had occasion to see in a distressed condition at the PAB briefly. She also overheard, during her incarceration, conversations between detectives indicating that they were acting in concert in conducting the several interrogations.

## E. *The McCandlesses*

John and Nancy McCandless were also neighbors of the Santiagos. At 10:30 a. m. on October 5, 1975, they were asked by three Philadelphia detectives to go to the PAB for about a half hour to give a formal statement. Upon arrival they were immediately separated and interrogated. John McCandless denied knowledge of the firebombing. When he persisted in that denial he was struck by an unidentified detective. Later that detective returned and said the bomb thrower had been apprehended, but McCandless was involved. When he again professed innocence, McCandless was struck. Defendant McMillan joined in the interrogation, accused McCandless of lying,

---

4. Vincent Cucinotta was prosecuted with Ronald Hanley by the federal government for conspiracy to firebomb the Santiago home, but was found not guilty by the same jury which convicted Hanley.

5. She testified that her motives for concealment were the possible involvement of her husband, who had spoken to Hanley and McGinnis sometime prior to the firebombing, and fear of retaliation against her by Hanley and McGinnis.

and threatened to stop McCandless' heart by punching him in the chest. He also told McCandless "when I get done with you, I'm going to work your old lady over and she won't hold up half as much as you did." McMillan left, and the first detective returned and administered more beatings, insisting that McCandless should confess his role in the firebombings. Unable to endure the pain, McCandless confessed to having aided Wilkinson in siphoning gasoline. This confession was false, in that McCandless had no involvement at all, and inconsistent with the confession which had been coerced from Hanley, in which Hanley said he supplied the gasoline to Wilkinson. The McCandlesses were kept at the PAB for approximately sixteen hours, until after Hanley's statement was obtained. Although he had confessed to participation, after Hanley's confession McCandless was released early in the morning of October 6, and was never charged.

As noted above, the beating of McCandless is corroborated by the testimony of Judith Cucinotta, who observed his appearance at the PAB.

## II. APPELLANTS' CONTENTIONS

Appellants have filed a joint brief in which they contend: that there was insufficient evidence of a conspiracy in violation of 18 U.S.C. § 241; that they were denied a fair trial because of prosecutorial misconduct; that the court erred in its charge and in its refusal to charge as requested; that the court erred in granting immunity to government witnesses; and that the indictment was duplicitous. We turn to those contentions.

### A. *Sufficiency of the Evidence*

■ The defendants argue that the government's evidence was insufficient to support a jury verdict that they conspired. That evidence, they submit, tends to show no more than several individualized attempts to coerce separate witnesses into making incriminating statements. In their defense all the detectives took the position that the beatings referred to above never

occurred. There was no testimony by a police informer detailing concert of action. Rather, the government's case on conspiracy was circumstantial. As we said in *United States v. Barrow*, 363 F.2d 62, 64 (3d Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967):

The crime of conspiracy . . . is seldom susceptible of proof by direct evidence. Proof of the crime may rest as it frequently does, on indirect or circumstantial evidence. The existence of a conspiracy may be inferred from evidence of related facts and circumstances from which it appears, as a reasonable and logical inference, that the activities of the participants in the criminal venture could not have been carried on except as the result of a preconceived scheme or common understanding.

Applying that measure of the sufficiency of circumstantial evidence of a conspiracy, there is more than ample evidence in this record of a common scheme or plan to solve a crime to the satisfaction of the conspirators by whatever means were necessary, including the violation of suspects' and witnesses' constitutional rights. All were engaged in a common endeavor. Each, the jury could find, beat one or more of the witnesses or suspects. Some moved from victim to victim. The false confession coerced from Wilkinson was tailored to fit the misinformation received from Garcia, and the false confession coerced from Hanley was tailored to fit that previously coerced from Wilkinson. All the victims were kept at the PAB until a "solution" satisfying the common purpose was obtained by virtue of Hanley's confession. When that was accomplished McCandless was released, although he had given a coerced confession inconsistent with Hanley's. The statements made by some participants disclosed knowledge of beatings by others, and thus disclosed that the conspirators were meeting together outside the interrogation rooms.

■ Relying on *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the defendants urge that, at

best, there were separate conspiracies participated in by some but not all of the detectives, rather than the single conspiracy charged. We conclude, however, that the controlling precedents are *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), and *United States v. Kenny*, 462 F.2d 1205 (3d Cir. 1972), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). The jury could, and did, find that the defendants were united in a common scheme of obtaining a satisfactory solution to the Santiago slayings by the illegal means of depriving suspects and witnesses of their Constitutional rights.

### B. *Prosecutorial Misconduct*

The defendants urge that a new trial is required because of remarks by the prosecutor in his opening speech, during the trial and in his closing argument.

■ Of ten references to the opening speech pressed on appeal, only four were objected to in the district court and pressed as grounds for a mistrial (46a). The court denied this motion, and instructed the jury, as he had before the prosecutor's opening statement, that that speech was not evidence, and that no conclusions should be drawn or opinions formed from it. Our examination of the opening statement convinces us that each of the matters objected to was a proper reference to anticipated testimony, or a reasonable form of descriptive argumentation. Perhaps the reference closest to marginal propriety is the sentence:

> Anyone who remembers Cardinal Mindszenty or American prisoners of war in Vietnam or Korea can remember what distortion of truth and right can occur. (25a).

This was said in the context of a discussion of the privilege against self-incrimination and of the charge that the constitutional right had been violated. While a more apt analogy than brainwashing by foreign powers might have been chosen, we agree with the district court that it certainly was not so inflammatory as to require a mistrial. The other claimed improprieties were even less so.

■ The references to remarks by the prosecutor during the trial are, as alleged errors, even less persuasive. The prosecutor at one point said that Wilkinson's "life was at stake." This is objected to because in 1977, after the events in question, Pennsylvania abolished the death penalty. When Wilkinson was tried he was liable to the death penalty. The prosecutor referred to Wilkinson's mental retardation, and this is alleged to be unsupported in the record. There was an offer of proof, not admitted, as to his mental capacity. We find the reference to be harmless at worst. Defendants object to a reference to Exhibit G–36, an exhibit properly admitted in evidence. They also object to a reference to some of their number as a "goon squad." In this, the prosecutor merely quoted the witness, Ronald Hanley, who in turn quoted that description by Detective Kuhar of some of the defendants who had worked over Hanley. These and all the remarks complained of were either entirely proper, or if even marginally objectionable, clearly harmless.

■ Defendants charge that in closing argument the prosecutor (1) expressed his personal opinion as to their guilt, (2) expressed his personal opinion as to witness credibility, (3) made arguments on the basis of facts not in the record, (4) appealed to nonevidentiary reasons for convicting the defendants, and (5) improperly referred to Wilkinson's innocence of the murder charges on which he had been tried. Most parts of the closing argument now complained of were not objected to in the district court. To the extent that they were, we find that in context they were proper comments on the evidence or proper argument as to inferences which could be drawn therefrom.

### C. *The Court's Charge*

■ In order to convict under 18 U.S.C. § 241 the jury must find that a specific intent to violate constitutional rights was proved beyond a reasonable doubt. *United States v. Guest*, 383 U.S.

745, 753–54, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Discussing the substantive offenses under 18 U.S.C. § 242 (Counts II, III and IV), the court charged:

> There must, however, be a specific intent to deprive a person of a federal right made definite by decisions or other rule of law, that is, either by the expressed terms of the Constitution or decisions interpreting the Constitution. An act done in open defiance or reckless disregard of a Constitutional requirement which has been made specific and definite, may be found to have been done willfully within the meaning of the statute.

> To find a defendant guilty, it is necessary for the jury to find that such defendant had not only a generally bad and evil purpose, but also had the purpose to deprive the victim of a Constitutional right. (2998a).

Defining a § 241 conspiracy, the court charged:

> The Government must prove beyond a reasonable doubt that the purpose of the conspiracy was to violate the free exercise of a constitutional right as I have outlined that to you. (3011a).

Referring to overt acts in furtherance of the conspiracy, the court charged:

> [a]nd you must find that it was done for the purpose of depriving one or more of the alleged victims of their Constitutional rights. (3008a).

The defendants requested this additional instruction:

> The Defendants may not be convicted simply because they engage in a conspiracy and that one of the effects of the conspiracy was to violate the Civil rights of a particular complainant. The Government must show beyond a reasonable doubt that the *predominant purpose* of the conspiracy was to violate the exercise of a Constitutional right as I have outlined it to you. (emphasis supplied).

The effect of such a "predominant purpose" charge would be that if the jury found that the predominant purpose of the conspira-

tors was the solution of the Santiago slayings, it could not convict even if it found a specific intent to deprive the suspects and witnesses of their constitutional rights. While *Guest* and *Screws* require such a specific intent, they do not require that the immediate intent to violate constitutional rights predominate over the ultimate purposes which that violation is designed to achieve. We hold that the court's charge on intent was proper and the requested charge improper.

■ The defendants also contend that the court improperly referred in its charge to the absence of *Miranda* warnings to suspects detained and interrogated for lengthy periods. No objection was made to this part of the charge, and thus we can consider it only as plain error. Fed.R.Crim.P. 52(b). The court charged:

> Although the right to arrest without a warrant and length of time that a person may be detained all implicate rights of constitutional dimensions, under the charges on this indictment and the basis on which the government is submitting the case to the jury, as I understand it, there is no contention that the arrests or the detention in and of themselves amounted to a violation of the United States Constitution.

> However, these are all matters of the overall surrounding circumstances which the jury may consider in determining whether there existed a conspiracy to violate the Constitutional rights of the various persons interrogated as charged in the indictment.

> Whether or not the police advised the suspects of their so-called *Miranda* rights and warnings about which there was considerable testimony falls into the same category; as well as whether the police denied persons access to an attorney or held them incommunicado or continued questioning them after persons refused to answer further questions. (3016–17a).

■ The testimony as to the lack of *Miranda* warnings and the length of detention was presented as part of the government's circumstantial evidence of the existence of

a conspiracy. In charging that the jury could consider these matters as part of the overall surrounding circumstances in determining whether the conspiracy existed, the trial court did not commit plain error. The charge made clear that the lack of *Miranda* warnings and the length of detention were not in and of themselves the constitutional violations charged in the indictment.

Defendants cite *United States v. O'Dell*, 462 F.2d 224 (6th Cir. 1972), for the proposition that it was plain error to instruct the jury that it might consider these factors in determining whether a conspiracy existed, in that this allowed materials outside the scope of the charge to be used by the jury in determining guilt or innocence of the defendants. However, the *O'Dell* court found that it was not error for the trial court to instruct a jury on the nature of state laws since the state law violations "could provide some evidence of specific intent to deprive persons of [their civil] rights." *Id.* at 231. The error committed by the trial judge in *O'Dell* was that he suggested to the jury that the state law provided the standard for determining what rights were protected by the federal statute in question. *Id.* No similar error occurred here.

### D. *Immunization of Government Witnesses*

 The defendants contend that the grant of immunity to two government witnesses was improper. That contention as a ground for reversal is foreclosed by our holding in *United States v. Lewis*, 456 F.2d 404, 410 (3d Cir. 1972), that defendants have no standing to contest the propriety of grants of immunity to witnesses testifying against them. They also contend that the court erred in its charge to the jury on the effect of an immunity grant upon a witness' credibility. The charge was substantially that given, and approved by this court, in *United States v. Fineman*, 434 F.Supp. 197, 204 (E.D.Pa.1977), *aff'd*, 571 F.2d 572 (3d Cir. 1978), and we approve it.

The court charged:

The testimony of an immunized witness should be examined by the jury with care and with greater care than that of an ordinary witness.

That is not to say that because testimony is given by an immunized witness that it should be completely rejected or completely accepted merely because that witness had been immunized.

You may find that by reason of the immunity, the likelihood of it being truthful and accurate is lessened. On the other hand, you might conclude that the fact that the person can't be prosecuted for what he may then be testifying to would make his testimony more reliable or less likely to be false than if he had not been granted immunity.

It's for you to determine what weight to give the testimony of all witnesses. (2973a–74a).

### E. *Duplicity*

 Defendants contend that Count I of the indictment, on which they were convicted, is duplicitous. That contention was not raised in the district court. Since the defect of duplicity could have been cured before the case was submitted to the jury, the contention should not be considered now. Fed.R.Crim.P. 12(b)(2). But, in any event, we do not find that Count I suffers from the defect alleged. A duplicitous indictment is one charging two separate crimes in the same count. *United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975). In this case a single conspiracy to violate civil rights of several persons was charged.

### III. CONCLUSION

The judgments of sentence will be affirmed.