[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 601.]

THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v*. REINER, APPELLEE
AND CROSS-APPELLANT.

[Cite as *State v. Reiner*, 2001-Ohio-1800.]

*Criminal law—Witnesses—Immunity erroneously granted, when—Application of
Fifth Amendment privilege against self-incrimination.*

(Nos. 99-239 and 99-427—Submitted October 2, 2001—Decided November 28,
2001.)

APPEAL and CROSS-APPEAL from and CERTIFIED by the Court of Appeals for
Lucas County, No. L-97-1002.

UPON REMAND from the United States Supreme Court.

_____

**LUNDBERG STRATTON, J.**

{¶ 1} Matthew Reiner was convicted by a jury of involuntary manslaughter
for the death of his two-month-old infant son, Alex Reiner. Alex died as a result
of "shaken baby syndrome." In *State v. Reiner* (2000), 89 Ohio St.3d 342, 343-
345, 731 N.E.2d 662, 666-667, the court set forth the underlying facts of this case:

"On June 15, 1995, Deborah S. Reiner gave birth to twin boys named Alex
and Derek. Both boys were premature at birth but otherwise healthy. The Reiners
also had a two-year-old daughter named Amy. Following the birth of the twins,
both parents took time off from work to care for them. Matthew Reiner took leave
from his job as an engineer from June 15 to July 25, 1995. Deborah Reiner, a
dentist, did not return to work until August 14, 1995.

"The Reiners hired a full-time babysitter, Susan Batt, age twenty-four, to
care for their three children. Susan Batt began working on July 25, 1995, under
Deborah Reiner's supervision while Susan Batt became acclimated to the family.
During the first week of Susan Batt's employment, Deborah Reiner spent most of

her time at home. In the final two weeks before Deborah Reiner returned to work, she left the home on several occasions with Amy, leaving Susan Batt alone with the twins. Susan Batt became the full-time exclusive childcare provider on August 14, 1995.

"Over a period of two weeks, the following events occurred. Alex became ill the weekend of August 12, 1995. He appeared to be achy and vomited several times. Deborah Reiner called the pediatrician and then took Alex to an outpatient clinic on Sunday, August 13. The clinic doctor diagnosed stomach flu and recommended that Deborah Reiner give Alex Pedialyte.

"By Wednesday, August 16, 1995, Alex had improved and appeared to have recovered. The twins' pediatrician performed a well-care examination of both boys that day. The results were unremarkable.

"Deborah Reiner stayed home with the children on Wednesday, August 23, 1995, her regular day off. Alex seemed achy that day but had no fever. On Thursday, August 24, 1995, Susan Batt telephoned Matthew Reiner at work and reported that Alex had vomited in the morning. He told her to give Alex some Pedialyte. On Friday, August 25, Susan Batt telephoned Deborah Reiner at work to report that Alex had vomited. Deborah Reiner's mother came over Friday afternoon to help care for the children. Alex remained ill and vomiting over the weekend, still with no fever.

"On Monday, August 28, 1995, when Deborah Reiner returned home after work, Susan Batt reported that Alex had eaten well and taken two five-hour naps that day. He appeared achy but did not have a fever, and Susan Batt had given him Tylenol. Susan Batt left the Reiners that evening between 5:30 and 6:00 p.m. Later that evening, Deborah Reiner's parents stopped by to drop off Amy, who had spent the day with them. They stayed and visited until 7:30 p.m. when Matthew Reiner arrived home.

"Alex vomited again that evening at 9:00 p.m. The couple put the twins to bed at approximately 10:30 that night. Later, they heard Alex whimpering. Matthew Reiner took Alex downstairs. He claimed that he laid Alex on his (Matthew's) chest to try to get the baby comfortable and to fall asleep. Within a half hour, Alex's breathing became labored and he became unresponsive. Matthew Reiner took Alex to his bedroom to awaken his wife. She could not get Alex to respond, so Matthew Reiner called 911.

"When emergency personnel arrived, Alex had no pulse and was not breathing. His skin was blue. They transported Alex to a nearby hospital, where he was placed on a respirator. Two days later, on August 30, 1995, Alex was removed from life support and died.

"Dr. James Patrick, Lucas County Coroner, performed an autopsy. He concluded that Alex had died from 'shaken baby syndrome.' Dr. Patrick estimated that the time of injury was the evening of Monday, August 28, 1995, most likely within minutes of the onset of respiratory arrest when Matthew Reiner had been alone with Alex, but at most, within two to three hours of the onset.

"A grand jury indicted Matthew Reiner for involuntary manslaughter. The case proceeded to trial. The key issue at trial was the timing of the fatal trauma to Alex. The defense theory was that Susan Batt, not Matthew Reiner, was the culpable party. The defense presented evidence that all three Reiner children had been healthy from birth until the weekend of August 11, 1995, after Susan Batt became employed. Deborah Reiner testified that her children had no medical problems from the time of Alex's death until the trial, after Susan Batt left the Reiners' employ. Deborah Reiner also testified that no other family members had contracted a stomach virus or suffered symptoms similar to Alex's during the last two weeks of August despite their close proximity to Alex, in particular his twin, Derek, who slept in the same crib. There also was evidence of additional injuries to Alex and injuries to Derek. A hospital radiologist testified that x-ray films of

Alex taken at the hospital on August 29, 1995, indicated a broken rib and broken leg.  Subsequent x-rays of Derek indicated that he suffered from three broken ribs."

{¶ 2} The Reiners' babysitter, Susan Batt, was subpoenaed by both the prosecution and the defense.  Upon advice of counsel, she invoked her Fifth Amendment privilege against self-incrimination and refused to testify.  She had also invoked her Fifth Amendment privilege while testifying in the juvenile court proceeding.  Batt's counsel informed the court that she would not testify unless granted full immunity from prosecution.

{¶ 3} The prosecutor acknowledged that Batt was not the subject of any criminal investigation.  The prosecutor questioned whether a grant of immunity was applicable in this case, since during the investigation Batt had clearly indicated she lacked culpability.  Nevertheless, Batt's counsel insisted that Batt would assert her Fifth Amendment rights if called to testify by either the prosecution or the defense.  Consequently, the prosecution requested that the court grant Susan Batt transactional immunity pursuant to R.C. 2945.44 and compel her to testify.

{¶ 4} The court heard arguments from the defense, as well as from counsel for Deborah Reiner and the guardian *ad litem* for the Reiners' children that a grant of immunity to Batt would not further the administration of justice.  The court, however, decided that Batt's testimony should be available and granted her transactional immunity.  Susan Batt subsequently testified and denied all culpability.  She explained to the jury that she had refused to answer questions without a grant of immunity upon the advice of counsel although she had done nothing wrong.

{¶ 5} On September 23, 1996, a jury convicted Matthew Reiner of involuntary manslaughter.  Matthew Reiner appealed his conviction to the Lucas County Court of Appeals.  The appellate court affirmed the trial court's grant of transactional immunity to Susan Batt.  *State v. Reiner* (Dec. 18, 1998), Lucas App. No. L-97-1002, unreported, 1998 WL 879833.

4

**{¶ 6}** *State v. Reiner* (2000), 89 Ohio St.3d 342, 731 N.E.2d 662 ("*Reiner I*"), affirmed in part, reversed in part, and remanded to the trial court for a new trial consistent with the court's opinion. *Reiner I* concluded that the trial court had wrongfully granted immunity to Susan Batt. *Reiner I* held that the grant of immunity was unlawful because Batt lacked a valid Fifth Amendment privilege against self-incrimination, and it seriously prejudiced the rights of the defendant. *Id.* at 355, 731 N.E.2d at 675.

**{¶ 7}** The United States Supreme Court reversed *Reiner I* to the extent that the opinion held that Batt lacked a valid Fifth Amendment privilege. *Ohio v. Reiner* (2001), 532 U.S. 17, 121 S.Ct. 1252, 149 L.Ed.2d 158. The United States Supreme Court held that Batt had "reasonable cause" to apprehend danger from her answers if questioned at trial, although she denied any involvement in the abuse of the Reiner children. *Id.* at ___, 121 S.Ct. at 1255, 149 L.Ed.2d at 162-163. The court reasoned that Batt spent extended periods of time alone with Alex in the weeks before his death. She was with him within the potential time frame of the fatal trauma. The defense theory was that Batt was responsible for the baby's death. Under these circumstances, it was reasonable for Batt to fear that her answers to some questions might tend to incriminate her. The Supreme Court stated, "We do not, of course, address the question whether immunity from suit under § 2945.44 was appropriate." *Id.* at ___, 121 S.Ct. at 1255, 149 L.Ed.2d at 163. The Supreme Court then remanded for further proceedings consistent with its opinion.

**{¶ 8}** Pursuant to *Ohio v. Reiner*, we reverse *Reiner I* to the extent that it held that Batt lacked a valid Fifth Amendment privilege against self-incrimination. Nevertheless, we affirm our decision in *Reiner I* that the grant of immunity to Batt resulted in serious prejudice to the defendant and did not further the administration of justice. R.C. 2945.44.

**{¶ 9}** Immunity is a prosecutorial tool utilized to fulfill the government's need for testimony. *State ex rel. Leis v. Outcalt* (1982), 1 Ohio St.3d 147, 149, 1

OBR 181, 183, 438 N.E.2d 443, 446. The government typically requests that immunity be granted to a witness who is culpable to some extent but whose testimony will also implicate a defendant. Usually the witness's involvement in the situation is of a lesser nature. The government is willing to forgo prosecution of the less culpable witness in order to obtain testimony that is necessary to successfully prosecute the defendant.

{¶ 10} Here, the prosecution did not have two potentially culpable persons. Instead, this was an either/or situation. Either Reiner was guilty or Susan Batt was guilty. The government chose to indict Reiner and claimed that there was insufficient evidence to indict Batt. Batt continually claimed her innocence. However, immunity is not appropriate in the either/or situation; it could actually hinder the search for truth. The jury should have been permitted to hear Batt take the Fifth Amendment and to evaluate her testimony on that basis. The defense would have been able to present its theory of the babysitter's culpability without the court's giving the jury the impression that Batt was immune from prosecution because she did not commit the crime. Therefore, it did not further the administration of justice when the trial court agreed to grant her immunity from future prosecution. Instead, it severely prejudiced the rights of the defendant.

{¶ 11} Therefore, we reverse our holding that Susan Batt lacked a valid Fifth Amendment privilege against self-incrimination; however, we affirm our holding that the trial court's grant of immunity severely prejudiced the rights of the defendant and did not further the administration of justice. Should the state retry the defendant, Batt may assert her Fifth Amendment right against self-incrimination.

*Judgment accordingly*.

DOUGLAS and F.E. SWEENEY, JJ., concur.

PFEIFER, J., concurs in judgment only.

MOYER, C.J., WOLFF and COOK, JJ., dissent.

WILLIAM H. WOLFF, JR., J., of the Second Appellate District, sitting for RESNICK, J.

————————————

**COOK, J., dissenting.**

{¶ 12} In *State v. Reiner* (2000), 89 Ohio St.3d 342, 731 N.E.2d 662 ("*Reiner I*"), a majority of this court reversed Reiner's conviction based on a belief that the trial court should not have granted transactional immunity to Susan Batt in order to compel her testimony. *Id.* at 352-356, 731 N.E.2d at 673-676. Because Batt had consistently denied culpability for Alex Reiner's death, the *Reiner I* majority held that Batt lacked a valid Fifth Amendment privilege against self-incrimination and was therefore not entitled to immunity under R.C. 2945.44. *Id.* at 354, 731 N.E.2d at 674. The United States Supreme Court reversed *Reiner I* in a terse *per curiam* opinion that reiterated a longstanding principle of constitutional law: the Fifth Amendment protects the innocent and guilty alike. *Ohio v. Reiner* (2001), 532 U.S. 17, ___, 121 S.Ct. 1252, 1254, 149 L.Ed.2d 158, 162.

{¶ 13} Faced with the United States Supreme Court's reversal, this court has no choice but to recognize the validity of Batt's Fifth Amendment privilege against self-incrimination. Nevertheless, today's majority offers yet another rationale for reversing Reiner's conviction. Specifically, the majority holds that the trial court erred in granting Batt transactional immunity as a matter of Ohio law because the grant of immunity "did not further the administration of justice" and "severely prejudiced the rights of the defendant." The majority further opines that in this type of case—an "either/or situation," to use the majority's phrasing—immunity is an inappropriate obstacle to the "search for truth." For the reasons that follow, I dissent.

{¶ 14} A trial court may not grant immunity under R.C. 2945.44 unless (1) the witness refuses to testify based on the privilege against self-incrimination, (2) the prosecutor makes a written request to order the witness to answer, and (3) the

court informs the witness that he or she will receive transactional immunity. *State ex rel. Koren v. Grogan* (1994), 68 Ohio St.3d 590, 592, 629 N.E.2d 446, 448. Even if these three requirements are satisfied, the trial court may decline to grant immunity if "it finds that to do so would not further the administration of justice." R.C. 2945.44(A); see, also, *State ex rel. Leis v. Outcalt* (1982), 1 Ohio St.3d 147, 149, 1 OBR 181, 183, 438 N.E.2d 443, 446.

{¶ 15} The majority concludes that the grant of immunity in this case did not "further the administration of justice" and was therefore unlawful. Assuming *arguendo* that Reiner ever had standing to challenge the grant of immunity to Batt (on this or any other basis), the majority's holding is inherently suspect for its failure to acknowledge our deferential standard for reviewing such determinations.[1]

---

1. Some Ohio appellate courts have expressed the view that a criminal defendant lacks standing to challenge a grant of immunity to a witness. See, *e.g.*, *State v. Steverson* (Sept. 15, 1998), Franklin App. No. 97APA11-1466, unreported, 1998 WL 634949; *State v. Minnich* (Sept. 30, 1997), Huron App. No. H-96-060, unreported, 1997 WL 614944. Similarly, numerous courts in other states have held that a defendant lacks standing to contest the grant of immunity to a prosecution witness. See *People v. Rodriguez* (Colo.1996), 914 P.2d 230, 266-267; *Kerns v. State* (Wyo.1996), 920 P.2d 632, 637; *State v. Pierson* (1988), 208 Conn. 683, 688, 546 A.2d 268, 270; *Smith v. Commonwealth* (1982), 386 Mass. 345, 348-349, 436 N.E.2d 377, 379; *State v. Ahmadjian* (R.I.1981), 438 A.2d 1070, 1078; *State v. Phillips* (1979), 297 N.C. 600, 606-607, 256 S.E.2d 212, 216; *Commonwealth v. Showers* (1996), 452 Pa.Super. 135, 153, 681 A.2d 746, 755; *People v. Wisely* (1990), 224 Cal.App.3d 939, 943-944, 274 Cal.Rptr. 291, 294; *State v. Kingbird* (Minn.App.1987), 412 N.W.2d 350, 354. A number of federal courts also take this view. See *United States v. Ellis* (C.A.3, 1979), 595 F.2d 154, 163; *United States v. Hathaway* (C.A.1, 1976), 534 F.2d 386, 402; *United States v. Foster* (C.A.7, 1973), 478 F.2d 1001, 1003-1004; but, see, *Ellis v. United States* (C.A.D.C.1969), 416 F.2d 791, 799 (recognizing that defendant has standing to challenge grant of immunity "where the trial judge went outside his judicial province to grant immunity to a witness").

In *Reiner I*, the majority rejected the state's contention that Reiner lacked standing to challenge the grant of immunity to Batt. In doing so, the majority relied exclusively on its erroneous Fifth Amendment analysis:

"This argument [asserting a lack of standing] assumes that the grant of immunity met the statutory threshold of a valid privilege against self-incrimination. Because Susan Batt lacked a valid Fifth Amendment privilege against self-incrimination and the grant of immunity was unlawful, the state's standing argument lacks merit." *Reiner I*, 89 Ohio St.3d at 356, 731 N.E.2d at 675.

The *Reiner I* majority's standing analysis was inextricably intertwined with the Fifth Amendment analysis. Thus, the United States Supreme Court's reversal of *Reiner I* necessarily undermines this court's original resolution of the standing issue. The majority nevertheless decides the merits of the immunity issue in Reiner's favor without ever explaining how or why Reiner has standing under Ohio law to challenge the grant of immunity to Batt.

The decision whether a grant of immunity would further the administration of justice lies within the sound discretion of the trial court. *State ex rel. Ney v. Niehaus* (1987), 33 Ohio St.3d 118, 119, 515 N.E.2d 914, 916. Accordingly, a reviewing court must not disturb the trial court's decision on this issue absent an abuse of discretion. See *id.*; *State v. Tomlinson* (1997), 125 Ohio App.3d 13, 18, 707 N.E.2d 955, 958. When applying this standard of review, an appellate court is not free to substitute its judgment for that of the trial court. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308. Rather, reversal on appeal is warranted only when the trial court has exercised its discretion unreasonably, arbitrarily, or unconscionably. *Id.*, citing *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149.

{¶ 16} With today's decision, the majority implicitly holds that the trial court acted unreasonably, arbitrarily, or unconscionably in granting immunity to Batt. But the record reveals anything but an abuse of discretion. Before deciding to grant immunity to Batt, the trial court heard extensive argument from the parties about whether immunity would further the administration of justice. The trial court also allowed (over the state's objection) the Reiner children's guardian *ad litem* and counsel representing Reiner's wife to offer their arguments opposing immunity for Batt. After hearing all of the arguments, the trial court concluded that the interests of justice were better served by granting R.C. 2945.44 immunity and compelling Batt's testimony. Although it recognized that this decision foreclosed any future prosecution of Batt for Alex Reiner's death, the trial court expressly focused its interests-of-justice inquiry on the "interests of this trial, this defendant and this prosecution." In the trial court's estimation, those interests demanded that the state be able to present "the testimony of one familiar with facts surrounding and preceding the incident," subject to full cross-examination and penalty for perjury. In other words, Batt's testimony furthered the administration of justice by aiding the jury's search for the truth about Reiner's guilt or innocence.

**{¶ 17}** The majority cites nothing inherently unreasonable, arbitrary, or unconscionable about the trial court's method of deciding whether to grant transactional immunity to Batt under R.C. 2945.44. While it is true that the grant of immunity to compel Batt's testimony could have resulted in a cruel twist of fate—Batt could have conceivably exculpated Reiner and inculpated herself without risk of being prosecuted—the trial court was not required to second-guess the prosecutor's discretionary decision to take that risk. See *United States v. Doe* (1984), 465 U.S. 605, 616, 104 S.Ct. 1237, 1244, 79 L.Ed.2d 552, 562-563 (noting that the decision to seek immunity "necessarily involves a balancing of the Government's interest in obtaining information against the risk that immunity will frustrate the Government's attempts to prosecute the subject of the investigation"). The trial court acted well within its discretion in placing the interests of Reiner's trial at the forefront of its analysis. In finding otherwise, the majority simply substitutes its judgment for that of the trial court on the question of whether Batt's immunity furthered the administration of justice—a decidedly inappropriate approach for an appellate court reviewing a trial court's decision under an abuse-of-discretion standard. See *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 421, 674 N.E.2d 1159, 1164.

**{¶ 18}** Even if it were appropriate to utilize a less deferential standard of review, the majority fails to provide a sound explanation of why it believes the trial court acted improperly by granting immunity to Batt. According to the majority, the grant of immunity in a case such as this one (the so-called "either/or situation") "could actually hinder the search for truth." Under the majority's reasoning, the search for truth is better served by having a witness invoke his or her Fifth Amendment privilege against self-incrimination and *not testify at all*. This view is dubious in that it ignores the effect of a trial court's grant of immunity to a witness under R.C. 2945.44.

10

{¶ 19} When the trial court grants immunity to a witness under R.C. 2945.44, the witness may no longer assert the Fifth Amendment privilege against self-incrimination; the trial court may validly compel testimony on matters that could have potentially incriminated the witness absent the grant of immunity. See, generally, *Kastigar v. United States* (1972), 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212. A grant of immunity thus *facilitates* the search for truth by allowing the jury to hear testimony from a witness who would otherwise refuse to testify based on the Fifth Amendment privilege. Moreover, a grant of immunity guarantees that a witness will be subject to cross-examination, " 'the greatest legal engine ever invented for the discovery of truth.' " *California v. Green* (1970), 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497, quoting 5 Wigmore, Evidence (3 Ed.1940), Section 1367. It is for these very reasons that immunity statutes such as R.C. 2945.44 are "essential to the effective enforcement" of criminal laws and " 'part of our constitutional fabric.' " *Kastigar*, 406 U.S. at 447, 92 S.Ct. at 1658, 32 L.Ed.2d at 218, quoting *Ullmann v. United States* (1956), 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511, 524.

{¶ 20} The majority fails to recognize the important and beneficial consequences of a grant of immunity and instead embraces a puzzling theory. Today's decision essentially takes the view that no testimony whatsoever (*i.e.*, when a witness invokes the Fifth Amendment) serves the search for truth better than full testimony subject to searching cross-examination (*i.e.*, when the witness is granted immunity), at least in the so-called "either/or" situations. The majority's conclusion is all the more perplexing given its own recognition in this case that "[t]o 'further the administration of justice,' the jury should have been able to hear and evaluate all the evidence to decide whether someone other than Matthew Reiner was responsible for Alex's death." *Reiner I*, 89 Ohio St.3d at 356, 731 N.E.2d at 675. Despite the trial court's allowing the jury that very opportunity by compelling

Batt's testimony under a grant of immunity, the majority curiously concludes that immunity somehow prejudiced Reiner's rights by impeding the search for truth.

{¶ 21} The majority further supports its holding with the notion that Batt's immunity gave "the jury the impression that Batt was immune from prosecution because she did not commit the crime." The interests of justice would have been better served, in the majority's estimation, if the trial court had permitted the jury to "hear Batt take the Fifth Amendment and to evaluate her testimony on that basis." As a general proposition, however, the majority's analysis is questionable at best. It is unclear how a trial court's grant of immunity, in any situation, would give the jury an impression of the witness's innocence. A jury could—and more likely would—infer that a witness who is testifying under a grant of immunity was potentially culpable of some offense relating to the subject matter of his or her testimony. Indeed, the very existence of immunity statutes "reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime." *Kastigar*, 406 U.S. at 446, 92 S.Ct. at 1657, 32 L.Ed.2d at 218.

{¶ 22} Moreover, the majority's view that the grant of immunity to Batt somehow acted as a declaration of her innocence fails to find support in the trial record. While Batt was on the witness stand, counsel for both parties repeatedly referred to Batt's having received immunity after having invoked her Fifth Amendment right against self-incrimination. On one occasion, the jury heard Reiner's counsel impeach Batt with the fact that she refused to testify until she received immunity:

"Q [by Reiner's counsel] Miss Batt, is it true that as late as yesterday morning you refused in this courtroom, where you were sitting then where you are now, to testify as a witness in this case pursuant to subpoena unless and until the State of Ohio through an Order of Her Honor, Judge Lanzinger, granted you

12

immunity from prosecution for any criminal act or acts committed against any one or more of the Reiner children * * *?

"A [by Batt] Yes."

{¶ 23} On yet another occasion, during recross-examination, the jury again heard Reiner's counsel inquire about Batt's refusal to testify until she received immunity from prosecution:

"Q You were unwilling, were you not, until two days ago to come to this court to tell the truth * * * until and unless the Court granted you immunity from prosecution for the death of Alex and injuries to Derek; isn't that true?

"* * * [State's objection overruled.]

"A Yes."

{¶ 24} Batt further admitted that she had invoked her Fifth Amendment right against self-incrimination during both Reiner's trial and a prior juvenile court proceeding. Thus, the jury learned (1) that Batt had invoked the Fifth Amendment in two different court proceedings relating to Alex's death and (2) that Batt had refused to testify at Reiner's trial until guaranteed immunity from prosecution. Given all the jury heard about the circumstances surrounding Batt's testimony, the majority's belief that the trial court somehow gave "the impression that Batt was immune from prosecution because she did not commit the crime" is profoundly misguided.

{¶ 25} For the foregoing reasons, I decline to join the judgment of the majority and would instead find that the trial court did not abuse its discretion in granting R.C. 2945.44 immunity to Batt. This court's decision in *Reiner I* was unfortunate in that it committed an obvious error of constitutional law that the United States Supreme Court thought grievous enough to correct in a summary reversal. Today's decision may well be even more unfortunate, for the majority makes a mistake of Ohio law that no higher judicial authority can correct.

MOYER, C.J., and WOLFF, J., concur in the foregoing dissenting opinion.

_____

*Julia R. Bates,* Lucas County Prosecuting Attorney, *John J. Weglian, J. Christopher Anderson* and *Craig T. Pearson*, Assistant Prosecuting Attorneys, for appellant and cross-appellee.

*Fritz Byers; Cooper, Walinski & Cramer* and *Richard S. Walinski*; *Robert Z. Kaplan* and *Samuel Z. Kaplan,* for appellee and cross-appellant.

_____