[Cite as *State v. Smith*, 2012-Ohio-2722.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 10 MA 172 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| TIMOTHY D. SMITH | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas of Mahoning County, Ohio
Case No. 09 CR 619

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman Street, 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant: Atty. J. Dean Carro
The University of Akron School of Law
Office of Appellate Review
150 University Avenue
Akron, Ohio 44325-2901

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: June 13, 2012

[Cite as *State v. Smith*, 2012-Ohio-2722.]
WAITE, P.J.

## Summary

{¶1}   Appellant Timothy Smith was convicted on charges of armed robbery and failure to comply with an order or signal of a police officer.  Appellant's defense centered around the suggestion that his brother, Josiah Smith, actually committed the crimes.  On appeal, Appellant's four assignments of error challenge the sufficiency and weight of the evidence supporting both convictions, as well as the trial court's decision to admit surveillance photographs and refuse to allow Josiah Smith to invoke his Fifth Amendment privilege concerning a collateral matter.  Both convictions were supported by probative evidence on each element of the crimes charged.  Appellant's challenge to each conviction goes to the identity of the perpetrator and not the elements of the offense.  Appellant presented no alibi, contradictory evidence, or testimony at trial.  The state's uncontradicted evidence, including the victim's emphatic identification of Appellant and not his brother as her assailant, was sufficient to convict.  The convictions were also not against the manifest weight of the evidence.  The trial court's rulings were within the bounds of discretion.  Appellant's four assignments of error are without merit and are therefore overruled.

## Factual and Procedural History

{¶2}   On April 30, 2009 the victim, Trisha Harman, was working the night shift at Austinwoods Nursing Home in Austintown, Ohio.  Around three o'clock in the morning she took her break and drove to pick up fast food.  She then returned to Austinwoods and parked at the rear of the parking lot in the designated smoking

area. She had her keys in the ignition and was listening to the radio but the engine was off. As she sat in her car with the doors closed, another car pulled up and parked parallel with and to the right of her car, about two spaces over. The car was older and gray in color. She thought it was a four door model. She was not initially concerned by the arrival of another car because it was about the time the laundry aides came to work. (Tr. Vol. III, p. 496.) According to Ms. Harman, the parking lot was fairly well lit, but was slightly dimmer in the back where she was parked. She was nevertheless able to get a good look at the car. (Tr. Vol. III, pp. 498-499.) At trial, she identified photographs depicting side and rear views of the vehicle apprehended by the police later that morning as the vehicle driven by her assailant. The photos she was shown were taken at the Sheetz gas station on the corner of Mahoning Ave. and State Route 46 in Austintown.

{¶3} As Ms. Harman was sitting in her car, she noticed a young African-American male wearing a white tee shirt and shorts walking toward her from the gray car. She observed that the man's hair was in braids and that he was fairly tall. The man was unfamiliar to her. When he reached her side of the car, he opened the door and asked her where he was. As she began to respond, he pulled a gun from under his shirt, jammed it into her side, and demanded her money and her ID. Ms. Harman was very focused on the gun, but is generally unfamiliar with guns. The gun appeared to her to be similar to the older style revolvers in western movies that have to be cocked to fire. (Tr. Vol. III, pp. 532-533.) She did not recall her assailant touching anything in her car, although he touched the door initially to open it. Ms.

Harman gave him the ten dollars in her wallet and when he was not satisfied, an additional forty dollars from the glove box. Although her ID was also in the glove box, she hid it under papers because she did not want the assailant to know her address. (Tr. Vol. III, p. 501.)

{¶4}  The assailant jammed the gun into her side, grabbed her arm, and told her that he would shoot her if she didn't give up her ID. She did not give him the ID. (Tr. Vol. III, p. 502.)  He then took the car keys, her cell phone, cigarettes, and her food. He briefly considered taking her with him so she could not call the police, and he asked her if she dated black men. She did not respond. At this point she was crying and her assailant told her to stay quiet, and that he was "sorry that he had to do this, but he needed money for his son" and that he would bring "all that stuff" back tomorrow if she did not call the police. (Tr. Vol. III, p. 503.)  He told her he would kill her or he would send people to kill her if she contacted the police and that he had "goons" in the area. (Tr. Vol. III, p. 505.)  Ms. Harman told him that it was the end of her break and people might wonder where she was. He finally let go of her and allowed her to get out of the car and step past him. She hurried away from him as he stood by her car. When she passed the assailant's car, she glanced at and tried to memorize the license plate number. He shouted at her to remember he would kill her if she called the police. As Ms. Harman was entering the nursing home, her assailant returned to his own car and exited the parking lot toward Kirk Road.

{¶5}  Ms. Harman ran into the building and told her supervisor what had happened. The supervisor called 9-1-1 and handed Ms. Harman the phone. The

police officer who responded to the scene later described the information Ms. Harman provided to the dispatcher as "very accurate" descriptions of the car and license plate, as well as a physical description of her assailant. (Tr. Vol. II, p. 327.) The license plate number provided by Ms. Harman during the call was EXP 4582. This information was immediately broadcast and several police officers responded to the call. She also made a written statement for the officer at the scene and later gave additional written statements to the detective at the Austintown Township Police Department.

{¶6} Sergeant Hoelzel, who was the midnight shift supervisor on duty at the time for Austintown Township Police, was the first officer to respond to the call. The 9-1-1 call was received at 3:14 a.m., the officer arrived on the scene at 3:19 a.m. and interviewed Ms. Harman. He described Ms. Harman as traumatized but alert, rational, and capable of giving a coherent statement and communicating good, clear information. When questioned by the dispatcher and by the officer, Ms. Harman gave the same description of her assailant: a black male wearing a white shirt, white shorts, with braided hair and crooked front teeth. The officer stated that Ms. Harman was especially emphatic about the braids and the teeth. At the scene he also examined her car, but did not see any indication that the assailant had left fingerprints or other evidence, so it was never processed for evidence. The officer confirmed to the other units responding that the information already broadcast was apparently accurate and left the scene.

**{¶7}** Sergeant Hoelzel subsequently attempted to assist other officers in pursuit of a vehicle travelling eastbound on Mahoning Ave., but was too late to intercept the suspect. He returned to the police department. At 4:16 a.m., in response to the request of another officer involved in the ongoing investigation of the robbery, Sergeant Hoelzel ran the plate number of the vehicle he had attempted to intercept, which had become the subject of a high speed chase. The computer identified Josiah Emanual Smith as the owner of the vehicle. The sergeant's report of the incident was prepared, approved, and logged that night; the matter then passed on to the detectives' division.

**{¶8}** Patrolman Heinz was on duty during the April 29th to April 30th nightshift and heard the dispatcher describe the suspect over the radio. The description he recalled was of a black male, wearing a white shirt, white pants or shorts and braided hair and driving a gray car. He also recalled a possible license plate number for the vehicle. As he was not actively responding to a call at that time, he decided to drive around in the area of Austinwoods to see if he could find the suspect. As the patrolman turned south on State Route 46 he observed a black male in a white shirt and tan shorts with braided hair pumping gas into a gray car at a Sheetz gas station on the corner of Mahoning Ave. and State Route 46 in Austintown. At trial, he was shown surveillance photos provided by the gas station. He identified the person and vehicle he observed as well as himself, in his marked police cruiser, as he followed the individual out of the gas station parking lot. When he first observed the car at the gas station he radioed the dispatcher to rebroadcast the description so he could

verity his identification. The license plate number of the vehicle he observed was EPX 5482 – the same letters and numbers provided by the victim, but with the P and X and the 4 and 5 transposed.

{¶9}   When the patrolman verified the description of the assailant and the vehicle, he activated the lights on the marked cruiser he was driving and pulled behind the gray car as the suspect was getting into the car. The suspect pulled onto Mahoning Ave., travelling eastbound. When the car pulled onto the road, the patrolman activated his siren and followed the car eastbound toward Youngstown. The suspect accelerated and continued down Mahoning Ave., weaving in and out of traffic. He attempted to make a left turn and failed, running into a curb, then continued through Youngstown, until ending at Plazaview Court, a housing project.

{¶10}  The patrolman followed the vehicle into a parking lot where the suspect initially pulled up to a large curb. The patrolman exited his cruiser with his firearm and ordered the suspect to get out of the car. The suspect then accelerated the vehicle over the curb and a low wall and down a set of concrete stairs. The patrolman initially ran after the car, but as it started down the stairs, he ran back to his own vehicle to pursue the car at the bottom of the stairs. When the patrolman and other officers reached the bottom of the stairs in a separate parking lot, the gray car was there with the driver's side door open, but the suspect had fled on foot. A white tee shirt was on the ground near the vehicle. The shirt was not weathered or wet and did not appear to have been run over, thus it appeared to have been recently discarded. (Tr. Vol. III, p. 477.) Due to the shirt's proximity to the car and

unweathered state, it was believed to have been left by the suspect as he fled and was collected as evidence. A K-9 unit arrived and tracked the suspect to an apartment block but could not identify which, if any, apartment the suspect entered. Four .38 caliber bullets were recovered from the car, as well as a black cellular phone. The car was towed as evidence.

{¶11} Ms. Harman testified at trial that she went to the Austintown Township Police Department later that day, April 30, 2009 and was shown a photo line-up. She identified the second photograph in the line-up based on the facial expression of the man depicted. Although she conclusively identified the second image, she was concerned because the person she recognized did not have braids and her assailant wore his hair braided. (Tr. Vol. III, pp. 510-512.) She explained her concern about the change in hairstyle to the police detective. She met the same detective, Detective Kosco, again the next day.

{¶12} At the second meeting, on May 1, 2009, she was shown a different photograph, this time a candid photograph, by Detective Kosco. The man in the photograph had braids, and this time she stated she was "[o]ne hundred percent" certain that the man in the photograph was the man who robbed her. (Tr. Vol. III, p. 514.) That same day, at the police station, she met Josiah Smith ("Josiah") in person. Seeing him in person, observing his height, weight and appearance at that time, she said she was certain he was not the man who robbed her. (Tr. Vol. III, pp. 564-565.) Appellant Timothy Smith and Josiah Smith, the owner of the car and who the victim initially identified as her assailant, are brothers. During her testimony, Ms.

Harman noted that the two brothers had similar features when their photographs were placed side by side. (Tr. Vol. III, p. 565.) Apart from the robbery she said she did not recognize or know either the first or the second man she identified as her assailant. She never recovered any of the property that was taken from her that night. At trial she re-identified Appellant, Timothy Smith, as the man who robbed her and reiterated that she was one hundred percent certain the identification was correct. (Tr. Vol. III, pp. 516; 565.)

{¶13} At trial, Josiah Smith did not testify voluntarily, but had to be subpoenaed. According to his testimony, in April of 2009 he owned two cars: a '97 Cutlass and a 1990 Oldsmobile Ciera. Josiah is three years younger than Appellant, who is his full biological brother. At the time of the robbery, Josiah did not have children. Appellant had a son. On April 30, 2009, Josiah worked the night shift at a Burger King in Youngstown, where he was still employed at the time of trial. His time sheet, which reflects the clock-in and clock-out times recorded by his employer, indicates that he clocked out at 2:28 a.m. on April 30, 2009. According to his testimony, Josiah was driving the Cutlass, not the older Oldsmobile, that night. He said that he went from work to his girlfriend's house and then home.

{¶14} In April of 2009, Josiah was living on Second St. in Youngstown with his parents. Appellant was not living there, but appears to have been staying with his girlfriend in Plazaview Court. Josiah stated that when he and his girlfriend arrived at his parents' house they sat in the driveway and continued an argument they had been having all night. While they were arguing, they heard police sirens and looked

up to see a car that looked like Josiah's gray Oldsmobile drive down the street. Josiah testified that he had loaned the car to his brother, but that as far as he knew his brother could have allowed someone else to use it that night. When Josiah saw what looked like his car being pursued by the police, he left his girlfriend to see what was happening. During cross-examination Josiah explained that he left his girlfriend in the driveway and drove after the gray car, following it down "to the projects," but when he saw the police cruisers he turned around rather than find out for sure if it was his car. When defense counsel questioned why he decided to return home, he responded: "I ain't got no license" and said he "wasn't trying to get in between that." (Tr. Vol. III, pp. 420-421.)

{¶15} Josiah's testimony as to the following events is convoluted. According to Josiah's testimony during direct and as it was further developed on cross-examination, at some point later that day (April 30, 2009) he learned through his sister, his girlfriend and her brother that his name might have been mentioned in connection with the chase and the car. After learning he might be a suspect, Josiah and his girlfriend visited his sister. While Josiah remained at his sister's house, his sister (who knew the victim's sister) and Josiah's girlfriend went to Ms. Harman's house, where they confirmed that he had been identified by Ms. Harman as her assailant. Josiah's sister and his girlfriend picked him up from his sister's house and took him to the police department. Josiah's sister and girlfriend had arranged that Ms. Harman and her sister would be at the police department at the same time so that Ms. Harman could verify whether there had been a misidentification.

**{¶16}** The sequence of events at the police department is unclear from Josiah's testimony, however, it appears that he met with Detective Kosco and gave a statement and that Ms. Harman had a chance to look at him closely and conclude that he was not the man who robbed her. (Tr. Vol. III, pp. 441-442.) When Josiah spoke with the detective on May 1, 2009 he told the detective that he saw his brother, Timothy Smith, driving by the house on Second St. in his gray car and heard sirens. (Tr. Vol. III, p. 454.) Josiah testified that when he went to the police department he took his time slip, his driver's license, and apparently, a photograph of Appellant with his hair in braids. However, when later questioned by the prosecutor about whether he brought his driver's license to the police department, Josiah attempted to invoke the Fifth Amendment. The court suspended his testimony and the jury was briefly dismissed. After dismissing the jury, the court discussed the issue off the record with the prosecutor and defense counsel.

**{¶17}** When the record resumed, but before the jury returned, the court summarized for the record that the state had inquired whether Josiah brought his driver's license with him when he went to the police department and Josiah asked if he could "plead the Fifth" in response to this question. (Tr. Vol. III, p. 396.) The court stated that the prosecutor indicated to the court that the state had no intention of charging Josiah in connection with the events of April 30, 2009. The prosecutor interjected to clarify that the state had determined the perpetrator was Appellant, that Appellant had been charged and was presently on trial, and that although Josiah was briefly a suspect, he was no longer being investigated in connection with the robbery.

The prosecutor also said that the state had no intention of pursuing charges against Josiah for driving while his license was suspended. It appears from the record at this point that Josiah was concerned with testimony about his driver's license because it was suspended at the time and he was driving illegally. The court then directed the witness to answer the question concerning his license and told him that he could not invoke the Fifth Amendment to avoid testifying in response to the prosecution's questions.

{¶18} Defense counsel intervened at this point and asked the court whether the witness had been granted immunity. The court clarified that immunity was not being offered, and that from the court's perspective it was not appropriate under the circumstances. Defense counsel then asked: "So if he should make inculpatory statements, either on direct or cross examination, then he's not immune from prosecution?" to which the court responded, "[i]f he is going to make any inculpatory statement as it relates to the incidents of April 30, 2009, he would be able to ask me at that point in time, ask to invoke his constitutional rights to remain silent." (Tr. Vol. III, p. 400.) The record clearly reflects that immunity was not requested by the state and was not granted by the court. At this point the jury returned. Once the prosecutor resumed questioning, he again asked Josiah whether he took his driver's license with him when he went to the Austintown Township Police Department on May 1, 2009. As no response was forthcoming, the prosecutor asked the court to direct the witness to respond; the court instructed the witness to respond, and the witness said "[y]es." (Tr. Vol. III, p. 401.) No discussion of immunity occurred before

the jury; the prosecutor's discussion of the state's intentions occurred on the record, but not in front of the jury. Thus, the jury heard the prosecutor ask Josiah a question about his license, heard Josiah ask to "plead the Fifth" and were dismissed. When they returned, they heard the prosecutor asking the same question about Josiah's driver's license and the court directed the witness to respond to the question.

{¶19} The prosecutor attempted to have Josiah authenticate a photograph which he admitted that he recognized. When the prosecutor asked if it was a picture of Appellant, Josiah asked if he could remain silent and said he was not comfortable answering. When the court directed Josiah to answer, he identified from the photo his brother, his brother's girlfriend and his brother's son. The prosecutor then asked if this was the family photograph that he brought with him on May 1st when he met the detective. The witness denied bringing the photograph in and said he never gave it to the police. The prosecutor asked whether Appellant's hair was braided in the picture, and Josiah confirmed that his brother's hair was braided. The prosecutor asked whether in April of 2009 Josiah also braided his hair. Josiah said no, and stated that his hair was cut very short at that time.

{¶20} On cross-examination, Josiah testified that he knew the victim's sister, Tiffany, by her first name only. He said that he met her several years earlier with her then-boyfriend, Jay, who he also knew only by first name. Josiah did not know Ms. Harman nor did he know that "Tiffany's sister" worked at Austinwoods Nursing Home. He also testified that he never drove in Austintown but stayed in Youngstown, even though his workplace was very close to the border between the two, because he was

driving without a license. It was also revealed on cross-examination that Josiah's sister brought the family photograph that included Appellant when she took Josiah to the police department on May 1, 2009. (Tr. Vol. III, p. 438.) In September 2009, Josiah voluntarily met a police detective to have his mouth swabbed for DNA testing. (Tr. Vol. III, p. 449.)

**{¶21}** Detective Sergeant Kosco first became aware of the robbery at eight a.m. on April 30, 2009, when he began his shift. He interviewed Ms. Harman that day and again the following day, when he also interviewed Josiah. On May 1, 2009, the detective was notified twice that people were waiting for him in the lobby. He was reviewing reports of the incident when the first call came and did not immediately go down to the lobby. When he entered the lobby he found Ms. Harman and her sister as well as Josiah, his sister and his girlfriend. He interviewed the parties separately. He also said he received from Josiah a photo of Appellant with his son and girlfriend and later showed the photo to Ms. Harman, who changed her identification of her assailant from Josiah to Appellant based on that photo. He took statements from both Josiah and Ms. Harman that day. He also learned that Appellant's girlfriend lived at Plazaview Court, the housing project where the Oldsmobile was abandoned.

**{¶22}** The detective documented and released the gray Oldsmobile to Josiah on May 7, 2009. The vehicle was not processed for prints because there was no dispute that Josiah owned it and Appellant often borrowed the car. The detective also received surveillance footage from Sheetz gas station on a DVD which was produced by the station's recording system for the early morning of April 30, 2009.

He reviewed the footage and printed out the photographic images used by the prosecutor at trial. Although the tee shirt collected near the abandoned car remained in evidence, it was not until September of 2009 that DNA swabs were collected from Appellant and his brother by the detective and the evidence submitted to the lab for evaluation. When the detective reviewed the evidence on April 30th he noted that the shirt was improperly placed in a plastic bag. He removed it from the plastic bag and placed it in a paper bag to preserve the integrity of the DNA. The lab did not indicate that there was any problem recovering samples from the shirt.

{¶23} In September of 2009, the tee shirt was sent to North Carolina for analysis by an independent lab. A supervisor from the lab that analyzed the tee shirt testified at trial. He described the lab's accreditation, procedures, and interpreted the lab's findings concerning the shirt for the record. The lab received the tee shirt and two cheek swab samples, one from Josiah and one from Appellant. The lab took DNA samples from the under arm and neck areas of the tee shirt. The samples from the shirt were compared with the samples from each man. Josiah was ruled out by the lab as the source for the DNA that remained on the shirt. Appellant could not be ruled out. The witness concluded his testimony by saying that the DNA recovered from both the collar and underarm areas of the shirt was consistent with Appellant, Timothy Smith, and inconsistent with his brother, Josiah Smith.

{¶24} On June 25, 2009 Appellant was indicted by a grand jury on three counts. Count one, aggravated robbery, a first degree felony, is a violation of R.C. 2911.01(A)(1) and carried a firearms specification, a violation of R.C. 2941.145(A);

count two, kidnapping, also a first degree felony, is a violation of R.C. 2905.01(A)(2), also carried a firearms specification, a violation of R.C. 2941.145(A). Count three, failure to comply with an order or signal of a police officer, is a violation of R.C. 2921.331(B), and if found to be committed while fleeing after the commission of a felony, is a fourth degree felony (otherwise the offense is a first degree misdemeanor). Trial began October 25, 2010, and continued through October 26, 27, and 28.

{¶25} Trial concluded with jury verdicts of guilty on counts one and three, as well as a firearm specification for count one and a finding on count three that the failure to comply occurred immediately after the commission of an aggravated robbery, making the violation a felony. Appellant was found not guilty on count two, kidnapping, which nullified the second firearms specification. The trial court's judgment was entered on November 3, 2010 and sentencing was scheduled. At sentencing, the victim was unable to appear due to an illness. Appellant declined to make a statement due to his pending appeal. The judge referred to the firearm specification and the high speed chase as evidence of Appellant's disregard for public safety. He noted that, despite Appellant's recklessness, no one was physically injured and that this was the only mitigating factor. Appellant was sentenced to eight years for aggravated robbery, with an additional three years on the firearms specification, and eighteen months for failure to comply, all terms to be served consecutively, followed by five years of post-release control. Credit was given for five hundred and twenty-four days served. This appeal followed.

## **Argument and Law**

**{¶26}** As a preliminary matter, we note that prior to receipt by this Court all four volumes of the trial transcripts transmitted to us had the reporter's seal and notice cut, and are no longer certified for this reason. In addition to the broken seals, it appears that pages 699, 700, and 701 were removed and then reinserted after page 836 and the unnumbered Reporter's Note concerning exhibits. These pages are not cited or referenced by Appellant or Appellee in their arguments on appeal. Without a proper seal and certification of the trial transcript pursuant to App.R. 9(B)(6)(j) it does not appear the transcript can be treated as a complete record of the trial. Nevertheless, absent evidence to the contrary, the regularity of the proceedings below is assumed: "all reasonable presumptions consistent with the record will be indulged in favor of the validity of the judgment under review and of the regularity and legality of the proceeding below." *In re Sublett*, 169 Ohio St. 19, 20, 157 N.E.2d 324 (1959). The defect in the transcript was not identified by either party, and does not appear to affect this court's analysis of the arguments presented on appeal.

<u>Assignment of Error No. 1</u>

APPELLANT SMITH'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOLATED WHEN THE COURT FAILED TO PROPERLY GRANT A KEY WITNESS A VALID FIFTH AMENDMENT CLAIM OF PRIVILEGE ON WHICH TO REFUSE TO TESTIFY OR TO PROPERLY GRANT TRANSACTIONAL IMMUNITY BOTH OF WHICH

INHIBITED APPELLANT SMITH'S ABILITY TO PRESENT A DEFENSE.

**{¶27}** In analyzing Appellant's first assignment of error, we must carefully scrutinize the record concerning the witness's attempt to invoke his Fifth Amendment privilege against self-incrimination and the trial court's subsequent rulings. After already mentioning his driver's license during the prosecutor's direct examination, Josiah Smith was asked whether he brought his license with him to the Austintown Township Police Department on May 1, 2009. Josiah responded by asking if he could "plead the Fifth." (Tr. Vol. III, p. 396.) The court immediately suspended testimony and dismissed the jury. After the jury left the courtroom, the court and counsel had a discussion off the record. Before the jury was brought back to the courtroom, the court resumed the record and clarified that the witness had invoked the Fifth Amendment to avoid testifying that he brought his driver's license with him to the Austintown Township Police Department on May 1, 2009. The court explained that the state had assured the court that the witness was no longer a suspect in the robbery and that the prosecutor on behalf of the state said he had no intention of prosecuting Josiah for driving while his license was suspended. Josiah was instructed by the court that he had to answer the prosecutor's questions but that he was specifically not immune from prosecution for the robbery and car chase. The judge directly stated: "If [Josiah] is going to make any inculpatory statement as it relates to the incidents of April 30, 2009, he would be able to ask me at that point in time, ask to invoke his constitutional rights to remain silent." (Tr. Vol. III, p. 400.) The

state did not request immunity for the witness, the court did not grant immunity, and the witness was instructed that if he wanted to invoke the Fifth Amendment concerning the actual robbery, kidnapping or car chase this was still available to him at the appropriate time. The entire exchange took place while the jury was out of the courtroom.

{¶28} In his first assignment of error Appellant advocates a somewhat convoluted application of an Ohio Supreme Court plurality opinion reversing a trial court's decision to grant immunity. *State v. Reiner*, 93 Ohio St.3d 601, 757 N.E.2d 1143 (2001) ("*Reiner II*"). Appellant seems not to recognize the roles of the state and the court with regard to immunity: while the state may seek immunity for a witness, it is the court that decides whether to grant such immunity, and it is the court's role in granting immunity that created the outcome in *Reiner*. In the original *State v. Reiner* (*"Reiner I"*) the Ohio Supreme Court found that the trial court's grant of transactional immunity to a witness who continually asserted her innocence was invalid, because an innocent witness does not have a "real and appreciable" danger of incrimination, and therefore cannot invoke the Fifth Amendment privilege; no immunity was necessary. *State v. Reiner*, 89 Ohio St.3d 342, 352, 731 N.E.2d 662 (2000). The Court also found that the improper grant of immunity had prejudiced the rights of the defendant, who was asserting that this witness had actually committed the crime, and did not further the cause of justice as prescribed by R.C. 2945.44.

{¶29} The United States Supreme Court granted certiorari and reversed the Ohio Supreme Court's ruling denying an innocent witness a Fifth Amendment

privilege, emphasizing that the amendment protects the innocent, who "otherwise might be ensnared by ambiguous circumstances," as well as the guilty. *Ohio v. Reiner*, 532 U.S. 17, 21, 121 S.Ct. 1252, 149 L.Ed.2d 158 (2001) quoting *Grunewald v. United States*, 353 U.S. 391, 421, 77 S.Ct. 621, 61 L.Ed.2d 931 (1957). In *Reiner II*, on remand from the United States Supreme Court, a plurality of the Ohio Supreme Court found that, by granting transactional immunity to the witness, the trial court had improperly suggested to the jury the court's own belief in the witness's innocence. The plurality concluded that in a situation where the jury was faced with two possible guilty parties, the witness and the accused, it was reversible error for the trial court to telegraph its belief in the witness's innocence by granting her immunity.

{¶30} While a plurality opinion may be persuasive authority, because it lacks a majority it is not controlling precedent. *Hendrick v. Motorists Mut. Ins. Co.*, 22 Ohio St.3d 42, 44, 488 N.E.2d 840 (1986) (overruled on other grounds). Nor, in this instance, is it in any way applicable. This record clearly reflects that Josiah did not properly invoke the Fifth Amendment, the state did not request immunity, and the trial court did not grant immunity. No immunity issue exists. The witness was clearly instructed that although he could not plead the Fifth Amendment with regard to questions about the possessions he brought with him to the police department, or to avoid having to identify his brother in a photograph, he could invoke his right to remain silent if he felt his testimony inculpated him in any way with regard to the robbery. No discussion of immunity occurred in front of the jury. No discussion of the state's decision not to indict Josiah for the robbery or for driving without a license

occurred in front of the jury. The suggestion that the court believed the witness was innocent and telegraphed that belief to the jury that concerned the plurality in *Reiner II* is entirely absent, here. Appellant argues that when the court instructed Josiah to answer the question about his driver's license, somehow this telegraphed the state's belief that Josiah was innocent of the robbery and prejudiced the defense. There are no set of facts, here, to support such a claim. Josiah was not granted any sort of immunity and the defense was not impacted in any way. Again, it is not the state's implied belief in the witness's innocence that concerned the plurality in *Reiner II*, it is the court's. Of course, there cannot be a clearer indication of the state's belief in Josiah's innocence than the decision to indict and try Appellant and not his brother. The state's decision to indict one brother and not the other is in no way improper. The trial court's decision to instruct Josiah to respond to questions concerning the items he brought with him to the police department and to respond to questions about the candid photograph of his brother were in no way indicative of any belief in Josiah's innocence. Hence, the trial court's action were entirely appropriate. Appellant's first assignment of error is without merit and should be overruled.

<u>Assignment of Error No. 2</u>

APPELLANT SMITH'S CONVICTION FOR AGGRAVATED ROBBERY PER R.C. 2911.01 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF SECTION 3 ART. IV, OF THE CONSTITUTION OF THE STATE OF OHIO, THUS CREATING A MANIFEST MISCARRIAGE OF JUSTICE BECAUSE THE GREATER

WEIGHT OF THE EVIDENCE SHOWED THAT ANOTHER SUSPECT COMMITTED COMMITTED [SIC] THE OFFENSE.

**{¶31}** When determining whether a criminal judgment is against the manifest weight of the evidence, this Court acts as a "thirteenth juror" to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). The verdict is not against the weight of the evidence when the record contains evidence which, if believed, will convince the average person of the accused's guilt beyond a reasonable doubt. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978).

**{¶32}** "A verdict that is supported by sufficient evidence may still be against the manifest weight of the evidence. 'Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" ' (Emphasis sic.)" (Internal citations omitted.) *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶24, quoting *Thompkins*, *supra*, at 387. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine.

*State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶33} Appellant was convicted on one count of aggravated robbery with a firearms specification. Aggravated robbery is defined by R.C. 2911.01 and 2913.02 which provide in pertinent part:

No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.

**2913.02 Theft**

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

* * *

(4) By threat

(5) By intimidation.

**{¶34}** Ms. Harman reported the crime within seconds of the incident. She provided coherent and consistent descriptions of her assailant to the dispatcher, the responding officer, and the police detective. She described being threatened, forcibly detained, and told she would be killed if she did not turn over her money and property. She was told she would be killed if she told the police what had happened. Her assailant told her he was committing these crimes to benefit his son. Ms. Harman initially identified Appellant's brother Josiah, the owner of the car used during the commission of the crime and who was included in the initial photo line-up because he was the owner of the car and for no other reason or independent suspicion. The victim had reservations about her initial identification, due to the hairstyle of her assailant, which were expressed at the time of the identification.

**{¶35}** The very next day, when she was shown a photograph of Appellant and had a chance to see Josiah in person, she identified Appellant, not Josiah, as her assailant. Since that time and at trial she has consistently identified Appellant as her assailant with "[o]ne hundred percent" certainty. The witness acknowledged the similarity between the two men due to their biological relationship as an explanation of why her initial identification was mistaken.

**{¶36}** At trial, Josiah testified that he never wore his hair in braids. It also appears that at the time the incident occurred and at the time of trial his hair was too short to be braided. He also testified that he did not have children, while Appellant

has a son. Although defense counsel attempted to suggest that Josiah, and not Appellant, was responsible for the robbery, those attempts were limited to challenging the credibility of the witnesses and the quality of the investigation. Probative evidence was presented by the state on every element of the offense. No alibi, testimony, physical or documentary evidence was offered in support of the defense theory that Josiah committed the crimes. On appeal, Appellant does not dispute that the testimony presented supports the actual elements of the crimes charged. Appellant merely suggests that he was not the perpetrator. The victim gave direct testimony concerning the events. Appellant's brother gave direct, though reluctant, testimony showing that he was not involved. No countervailing evidence or testimony was offered. The question of the weight and credibility of the evidence was for the jury to determine. There is no indication in this record that the jury in this instance lost its way in finding Appellant guilty. Appellant's second assignment of error is without merit and is overruled.

<u>Assignment of Error No. 3</u>

THE STATE FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT SMITH WAS GUILTY OF FAILURE TO COMPLY WITH THE ORDER OR SIGNAL OF A POLICE OFFICER THEREBY VIOLATING HIS DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT.

**{¶37}** The sufficiency of the evidence "is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally

sufficient as a matter of law to support the jury verdict." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668, 691 (1997). To determine whether sufficient evidence exists to support a conviction, the reviewing court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "[I]n reviewing both weight and sufficiency of the evidence, the same test is applied. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." *Id.* at 273. "[T]he relevant inquiry does not involve how the appellate court might interpret the evidence. Rather, the inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. citing *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979).

{¶38} Failure to comply with an order or signal of a police officer is a violation of R.C. 2921.331 which provides in part:

(A) No person shall fail to comply with any lawful order or direction of any police officer invested with authority to direct, control, or regulate traffic.

(B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

**{¶39}** The testimony of the responding officer established that he was fully uniformed and driving a marked cruiser. Appellant does not dispute the authority of a uniformed officer on patrol in a marked car to make a stop. The officer pulled behind the vehicle, verified that it matched the description provided, and turned on his lights, which should have signaled Appellant to stop. Instead, the suspect pulled his car into the street, and the officer activated his siren. At this point, there is no question the officer provided the signal to stop. Instead, a pursuit ensued. At all times during pursuit both lights and sirens were activated on multiple marked police cruisers.

**{¶40}** When the vehicle finally stopped in the Plazaview Court parking lot, the responding officer exited the cruiser and explicitly instructed the driver to stop. This testimony is not challenged by the defense. According to testimony, Appellant habitually borrowed his brother's car, and was borrowing his brother's car that night. According to the victim, a car with a numbered plate closely matching that of the vehicle Appellant was driving that night was used to facilitate the commission of an armed robbery. A car matching the description provided by the victim, with a number plate bearing the numbers and letters given by the victim and driven by a man matching the description provided by the victim was identified within blocks of the location of the crime. The fact that the car and driver matched the description provided was verified by the officer present at the scene, who further identified the

individual and car he saw as well as himself in the security images provided by the gas station. The officer pursued the car to Plazaview Court apartments, where, according to testimony, Appellant's girlfriend lived. The officer found a shirt bearing DNA compatible to Appellant's next to the abandoned car at the apartment complex. Both Appellant and the car were conclusively identified by the victim as her assailant and his vehicle. No contradictory evidence, testimony, or other information was provided by the defense.

**{¶41}** The test for determining whether a conviction is supported by sufficient evidence is whether, "viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks*, *supra*, paragraph two of the syllabus. The facts as presented are probative of the essential elements of the crime. Appellant's identity as the driver was, again, an issue for the jury to determine, based on the evidence presented. The record reflects probative evidence on each element of the crimes charged and the conviction was therefore based on sufficient evidence in accordance with the law. Appellant's third assignment of error is without merit and is overruled.

<u>Assignment of Error No. 4</u>

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED THE STATE TO USE UNAUTHENTICATED PHOTOGRAPHIC EVIDENCE IN VIOLATION OF OHIO RULE OF EVIDENCE 801.

**{¶42}** In Appellant's fourth assignment of error he suggests there should have been an evidentiary challenge to the admissibility of the state's exhibits 7 through 11. Appellant actually challenges the sufficiency of the state's identification of Appellant as the individual at the gas station who led the patrolman on a high speed chase to the apartment complex where the car and the tee shirt were recovered. This argument was adequately addressed under Appellant's third assignment of error. However, we will briefly address the crux of Appellant's argument, even though not fully developed by him.

**{¶43}** Evid.R. 901, which requires authentication or identification prior to the admission of photographic evidence, applies to the exhibits at issue here. Ohio Evidence Rule 801, mentioned by Appellant, applies to hearsay issues, not to the admission of photographic evidence. State's exhibits 7 through 11 were photographic images selected and printed by Detective Kosco after reviewing the security footage provided by the gas station from the night of the robbery. They were introduced by the patrolman, who appears in some of the images and had first-hand knowledge of the location and individuals depicted at the time the images were captured. Photographs, such as these, are liberally admitted with this type of sponsoring testimony. Evidence Rule 901(A) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The Rule presents several non-exhaustive illustrations as to how the general requirement of authentication may be met for various types of evidence.

Applicable to photographic evidence are numbers 1 and 4, which provide that in order to authenticate images, testimony must be offered by a "witness with knowledge" who testifies that "a matter is what it is claimed to be," and that "distinctive characteristics and the like" (such as "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances") are sufficient to establish that the image shows what the proponent claims. Evid.R. 901(B)(1); (4).

{¶44} At trial, the photos were introduced by Patrolman Heinz, who testified that he saw a man matching the suspect's description at a Sheetz gas station. Later testimony from Detective Kosco established that he received the surveillance DVD from Sheetz and printed out the still images authenticated by the patrolman who appeared in them. In Ohio, photographic evidence need not be authenticated by the individual who created the image. Instead, any "witness with personal knowledge of the subject of the photograph may authenticate it by testifying that the photograph fairly and accurately depicts the subject at the time the photographs were taken." *State v. Andric*, 7th Dist. No. 06 CO 28, 2007-Ohio-6701, ¶14 *accord Midland Steel Products v. U.A.W. Local 486*, 61 Ohio St.3d 121, 130, 573 N.E.2d 98 (1991) and *State v. Hannah*, 54 Ohio St.2d 84, 88, 374 N.E.2d 1359 (1978). The patrolman's testimony describes what he saw that night and that it is reflected in the photos in question. The connection between the suspect and Appellant is established by the testimony of Ms. Harman identifying Appellant as her assailant and the car as her

assailant's car, as well as the patrolman verifying the individual's identification as the driver in the ensuing car chase.

**{¶45}** No objection was raised at trial to the testimony and the use of the photographs now alleged as error. Appellant has therefore waived all but plain error review of the admission of the photographs. Crim.R. 52(B). Use of the discretionary plain error doctrine requires an obvious error that affected substantial rights under exceptional circumstances. Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). An alleged error cannot rise to the level of plain error unless the outcome clearly would have been different if not for the error. *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996). A testimonial foundation for these photographs appears in the record. Whether the man depicted in the photographs was in fact the assailant and whether the assailant was Appellant were both questions for the trier of fact. The decision of the trial court to admit the photographs was not error. Appellant's fourth assignment of error is without merit and is overruled.

## Conclusion

**{¶46}** The state's uncontradicted evidence as reflected in the record before us was sufficient to convict. Appellant's conviction was also not against the weight of the evidence. There is no issue regarding witness immunity presented by this record. The admission of the surveillance photographs was not error. Appellant's four assignments of error are without merit and are overruled. The judgment of the trial court is affirmed in full.

Donofrio, J., concurs.

DeGenaro, J., concurs.